IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DANIELI CORPORATION and DANIELI &
C. OFFICINE MECCANICHE S.P.A.,

*Plaintiffs*,

v.

SMS GROUP, INC., SMS GROUP GMBH,
and STEEL DYNAMICS, INC.,

*Defendants*.

Civil Action No. 2:21-cv-1716

Hon. William S. Stickman IV

**OPINION**

WILLIAM S. STICKMAN IV, United States District Judge

## I.   INTRODUCTION

Plaintiffs Danieli Corporation and Danieli & C. Officine Meccaniche S.p.A. (collectively "Danieli") filed a four-count amended complaint ("Amended Complaint") against Defendants SMS Group, Inc. and SMS Group GMBH (collectively "SMS") and Steel Dynamics, Inc. ("SDI"). (ECF No. 171).  Relevant to the pending motion before the Court, Danieli's Amended Complaint alleges at Counts II and III that SMS misappropriated two iterations of Danieli's steel caster technology, which it maintains is a trade secret.  (*Id.* at 25–29).  At Count IV, Danieli also asserts that SMS was unjustly enriched through SMS's misappropriation and use of Danieli's proprietary information.  (*Id.* at 29–30).  Pending before the Court is SMS's Motion for Summary Judgment ("Motion") as to Danieli's Counts II, III, and IV.  (ECF No. 434).[1]

---

[1] There are currently four motions for summary judgment pending before the Court. (ECF Nos. 434, 441, 490, and 494).  The claims and counterclaims asserted amongst the three parties are considerably different, as are the arguments asserted in the parties' respective dueling motions for summary judgment.  As such, the Court will address each motion separately in separate opinions.

It is axiomatic that a tenable trade secret claim must be based on a trade secret or trade secrets. To get to a jury, a trade secret plaintiff must be able to articulate exactly what trade secret(s) it claims was/were misappropriated. After some dispute earlier in the litigation as to whether Danieli sufficiently identified the trade secret(s) at issue in this case, the Court ordered it to reduce its trade secret(s) to writing. As a result, Danieli produced its "Plaintiff's Trade Secret Statement" (the "Trade Secret Statement"). The Court finds that the Trade Secret Statement does not adequately describe a trade secret. What's more, Danieli shifted its position on what trade secret(s) is/are at issue multiple times since its production. The Court holds that Danieli has failed to adequately identify what trade secret(s) is/are the basis of its action, and thus its trade secret misappropriation claims cannot proceed. Further, as explained at length below, the failure of Danieli's trade secret claims is fatal to its unjust enrichment claim.

Therefore, SMS's Motion will be granted and all three of Danieli's claims against SMS will be dismissed.

## II.   FACTUAL BACKGROUND[2]

Danieli and SMS "have been competitors for decades and have at times submitted competing bids to supply steel slab casters to customers who produce steel around the world." (ECF No. 436, p. 5); (ECF No. 462, p. 9). The first relevant bid occurred in 2015, when both Danieli and SMS submitted proposals to the Shougang Jingtang customer ("Shougang"). (*See* ECF No. 436, pp. 8, 18–22); (ECF No. 462, pp. 27–28, 76, 78, 86, 89–90). Danieli's proposed

---

Accordingly, this opinion will only address SMS's Motion against Danieli. Opinions on the other motions will follow.

[2] At this stage, the Court recounts only the material facts relevant to the pending Motion before it. Because the Court is deciding SMS's Motion on a legal question—the sufficiency of Danieli's description of the trade secret(s) at issue—it is unnecessary to look too deeply at the extensive factual narratives set forth in the parties' submissions. The pertinent procedural background is discussed throughout the Court's analysis below in Section IV.

roll diagram for Shougang was entitled "QSP1." (ECF No. 436, pp. 21–22); (ECF No. 462, pp. 89–90).

In 2018, Danieli and SMS submitted competing bids to supply the caster for SDI's Sinton plant ("Sinton"). (ECF No. 436, p. 5); (ECF No. 462, p. 9). In its bid, Danieli proposed a similar, if not the same, roll diagram to that which it previously proposed to both Shougang and Nucor Gallatin, *i.e.,* an iteration of QSP1. (ECF No. 436, p. 20); (ECF No 462, p. 86). SMS also proposed a caster for Sinton that was substantially similar, if not identical, to its own Nucor Gallatin bid. (ECF No. 436, pp. 20–21); (ECF No. 462, pp. 86–87). Ultimately, SDI awarded the Sinton bid to SMS. (ECF No. 436, p. 5); (ECF No. 462, p. 9).

In July 2021, in connection with the Association for Iron and Steel Technology conference, SMS published a paper ("AIST paper") describing the caster technology it would be providing to SDI for Sinton. (ECF No. 436, p. 5); (ECF No. 462, p. 12). Upon Danieli's review of the AIST paper, it believed that SMS developed its design for Sinton using Danieli's trade secret information. (ECF No. 436, p. 5); (ECF No. 462, pp. 11–14). As a result, Danieli filed this suit in November 2021. (ECF No. 436, p. 5); (ECF No. 462, p. 11). In the course of this litigation, as recounted below, Danieli has taken multiple positions as to how SMS allegedly misappropriated its trade secret(s). Ultimately, it does not matter because Danieli is unable to sufficiently identify what trade secret(s) it contends SMS misappropriated.

### III.   STANDARD OF REVIEW

Summary judgment is warranted if the Court is satisfied that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material if it must be decided to resolve the substantive claim or defense to which the motion is directed. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is a genuine dispute of material

fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  The Court must view the evidence presented in the light most favorable to the nonmoving party.  *Id.* at 255.  It refrains from making credibility determinations or weighing the evidence.  *Id.* "[R]eal questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof[]" will defeat a motion for summary judgment.  *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007).

The Court notes that Rule 56 "mandates the entry of summary judgment … against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp.*, 477 U.S. at 322; *see also Fuentes v. Perskie*, 32 F.3d 759, 762 n.1 (3d Cir. 1994) (stating that the nonmoving party must "point[] to sufficient cognizable evidence to create material issues of fact concerning every element as to which the nonmoving party will bear the burden of proof at trial"). "[A] complete failure of proof concerning an essential element of the nonmoving party's [claim] necessarily renders all other facts immaterial," and thus "there can be 'no genuine [dispute] as to any material fact'" sufficient to survive the motion.  *Id.* at 322–23.  Moreover, judgment as a matter of law becomes appropriate.  *See id.* at 323; *accord Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014) ("[W]here a non-moving party fails sufficiently to establish the existence of an essential element of its case on which it bears the burden of proof at trial, there is not a genuine dispute with respect to a material fact and thus the moving party is entitled to judgment as a matter of law.").

#### IV.   ANALYSIS

**A.    Danieli cannot maintain its claims for misappropriation of trade secret(s) under the DTSA and PUTSA because it has not identified its trade secret(s) with sufficient particularity.**

SMS moves for summary judgment against Danieli's two trade secret misappropriation claims—one brought under the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b), and the other pursuant to the Pennsylvania Uniform Trade Secrets Act ("PUTSA"), 12 Pa. C.S.A. § 5301 *et seq.* (ECF No. 171, pp. 25–29). As observed by the United States Court of Appeals for the Third Circuit, the "DTSA and the PUTSA are substantially similar," and thus the analysis of Danieli's DTSA and PUTSA claims are coterminous. *Mallet & Co. v. Lacayo*, 16 F.4th 364, 381 n.19 (3d Cir. 2021).

The DTSA creates a private federal cause of action for the misappropriation of a trade secret. 18 U.S.C. § 1836(b)(1) ("An owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."). The Third Circuit has explained that a cause of action for trade secret misappropriation under the DTSA requires the plaintiff to demonstrate the following elements:

> (1) the existence of a trade secret, defined generally as information with independent economic value that the owner has taken reasonable measures to keep secret; (2) that "is related to a product or service used in, or intended for use in, interstate or foreign commerce[;]" and (3) the misappropriation of that trade secret, defined broadly as the knowing improper acquisition, or use or disclosure of the secret.

*Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 905 (3d Cir. 2021) (internal citations omitted).

SMS argues that Danieli fails under the first element. It contends that Danieli is unable to identify any trade secret with the requisite specificity, nor did Danieli take reasonable measures to keep its purported proprietary information secret. (ECF No. 435, pp. 14–26).

As to SMS's first argument, it asserts that Danieli failed to establish the existence of a particularly defined and protected trade secret. (*Id.* at 14). SMS argues that Danieli's submitted Trade Secret Statement "offers shifting, amorphous, and generic descriptions of supposed secrets[.]" (*Id.* at 16). It also highlights that the Trade Secret Statement "appears to gesture" at four theories of allegedly misappropriated trade secrets—its roll technology, its references to Appendix A as a whole, its know-how in the industry, and a combination of design elements. (*Id.* at 16–23). None of them, SMS contends, are sufficient to provide a specific description of a trade secret at issue. (*Id.*).

In response, Danieli argues that it sufficiently alleges that the trade secret SMS misappropriated is "the specific design of Danieli's QSP1 caster." (ECF No. 463, p. 10). Danieli points to a section of its Trade Secret Statement titled "The Trade Secrets at Issue Include Danieli's Proposal for Shougang Jingtang, Which SMS Misappropriated and Used for Its Sinton bid," which "explained in black and white what is secret in the QSP1 design[.]" (*Id.*). Danieli contends that its included itemized list of Shougang's design elements and excerpted roll diagram sufficiently detail Danieli's claimed trade secret. (*Id.*). It is thus this "specific design, embodied in specific documents, for a specific caster—the QSP1 Shougang design—" that Danieli asserts is its trade secret. (*Id.* at 15).

The DTSA provides a definition of "trade secret" as used in the Act:

(3) the term "trade secret" means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—

    (A) the owner thereof has taken reasonable measures to keep such information secret; and

(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information;

18 U.S.C. §1839(3). A plaintiff claiming trade secret misappropriation must provide a description of the alleged trade secret with sufficient specificity to allow the defendant, the Court, and the jury to understand the contours of the claim. This ensures that the defendant knows against what it is defending itself and for the court and/or jury to determine whether a trade secret was misappropriated. *See Mallet*, 16 F.4th at 384 (quoting *Oakwood*, 999 F.3d at 907 (stating that "care must be taken to not allow a plaintiff in a trade secret misappropriation case to make generalized claims that leave a defendant wondering what the secrets at issue might be")). In describing its trade secret, "the plaintiff has to provide something better than sweeping generalities for the court to work with." *Id.* at 387. Indeed, "the subject matter of the trade secret must be described 'with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies.'" *Oakwood*, 999 F.3d at 906 (citation omitted).

The decision of the United States District Court for the Western District of Wisconsin in *IDX Sys. Corp. v. Epic Sys. Corp.*, 165 F. Supp. 2d 812 (W.D. Wisc. 2001), *affirmed in relevant part*, 285 F.3d 581 (7th Cir. 2002) was instructive in the Court's analysis of whether Danieli has sufficiently identified a trade secret as a matter of law.

Plaintiff IDX Systems Corporation ("IDX") and Defendant Epic Systems Corporation ("Epic") were competing vendors for information management software for physicians' groups, hospitals, and other healthcare delivery systems. *IDX Sys. Corp. v. Epic Sys. Corp.*, 165 F. Supp. 2d 812, 814 (W.D. Wisc. 2001). IDX and Epic submitted bids to provide information management

software to The University of Wisconsin Medical Foundation ("UWMF"). *Id.* at 814–15. After both parties submitted bids to UWMF, it appeared that UWMF selected IDX as its software vendor by UWMF's decision to extend contract negotiations with IDX. *Id.* at 815. Though several contractual issues remained outstanding, IDX signed and forwarded a proposed contract to UWMF. *Id.* UWMF never signed the contract. *Id.* Instead, it entered into an agreement with Epic to buy Epic's software. *Id.* IDX brought a lawsuit after it discovered that UWMF disclosed detailed information about IDX's system to Epic. *Id.* Epic used this information to improve its own software and win the contractual award to provide its service to UWMF. *Id.*

IDX brought a trade secret misappropriation claim against Epic under the Wisconsin Uniform Trade Secrets Act ("WUTSA"), Wis. Stat. § 134.90.[3] *IDX*, 165 F. Supp. 2d at 816. As in this case, Epic asserted *ab initio* that IDX had not adequately identified a trade secret to maintain a claim for misappropriation. *Id.* Epic argued that IDX, as the plaintiff, had not described a trade secret with sufficient specificity to survive summary judgment. *Id.* The court recognized that "[b]y the summary judgment and trial stages [a] plaintiff must describe its trade secrets in sufficient detail such that a reasonable jury could find that [a] plaintiff established each statutory element of a trade secret." *Id.* at 817. "In other words, the description must be specific enough to allow the meaningful comparison of the putative trade secret with information that is generally known and ascertainable in the relevant field or industry." *Id.* Critically, the court explained that "[g]eneral allegations of the existence [of] trade secrets will not suffice—a reasonable degree of precision and specificity is necessary." *Id.* at 816.

---

[3] The WUTSA is substantially similar to the DTSA, and the two are interpreted identically. *See Bay Fasteners & Components, Inc. v. Factory Direct Logistics, LLC*, No. 17-CV-03995, 2018 WL 1394033, at *3 n.1 (N.D. Ill. Mar. 20, 2018); *Kuryakyn Holdings, LLC v. Ciro, LLC*, 242 F. Supp. 3d 789, 797–98 (W.D. Wis. 2017).

IDX pointed to three separate documents as containing the trade secrets it sought to protect—a Supplemental Answer to Interrogatories and two appendices (Appendix A and Appendix B). *Id.* at 817. The court described these three documents as follows:

> Plaintiff contends that it has met its burden to identify the specific trade secrets that it seeks to protect in this action. It relies exclusively on the Supplemental Answer and its appendices. The Supplemental Answer purports to provide nine summary descriptions of plaintiff's trade secrets. Appendix A contains "specific references" to technical documentation. Appendix B is a "forty two page complete description of the trade secrets." Plaintiff submits that these three documents, read together, create a definitive list of nine trade secrets.

*Id.* (internal citations omitted). The Court ultimately rejected IDX's contention that these three sources adequately described a trade secret. Specifically, related to the Supplemental Answer, the court explained:

> Plaintiff's Interrogatory Answer sets forth so-called summary trade secret descriptions. It lists as trade secrets the "concepts, designs, methods and processes that, in combination, provide:" (1) batch charge entry and batch payment posting, (2) heads down charge entry, (3) real time checking of charges, (4) heads down payment posting, (5) invoice level processing, (6) account inquiry, (7) end user reminder notices, (8) end user defined comments associable with a tickler system and (9) demand statements and statement messages.

> These nine items are not trade secrets themselves, but rather are areas of trade secrets. Each area is a feature, or functionality, of plaintiff IDX's Practice Management System. The trade secrets are more narrowly said to be the "concepts, designs, methods and processes" underlying each of these nine functionalities.

> * * *

> Plaintiff's Supplemental Answer is silent as to any specific concepts, designs, methods or processes underlying the functionalities. It designates nine functionalities as *trade secret areas* but fails to identify any trade secrets. The document does not identify any means devised by IDX to provide the nine functionalities. It succeeds only in describing the functionalities, specific abilities and benefits they provide IDX customers.

> * * *

> Plaintiff has pointed to nine features of its product, not trade secrets themselves, and asserted that their existence is the result of trade secrets. This is insufficient.

9

The Supplemental Answer, by itself, fails to carry plaintiff's burden of identifying specific trade secrets at risk.

*Id.* at 817–18 (emphasis in original) (internal citations omitted).

The court also rejected IDX's contention that its appendices were sufficient trade secret

descriptions:

Appendix A, however, is merely a list of twenty-one user manuals. Their extensive contents cover far more than the nine trade secret areas identified in the Supplemental Answer, and it cites no pages in reference to any specific trade secrets. Moreover, the list provides no indication as to those trade secrets or trade secret areas documented in any given manual. The only apparent way to search the manuals is through a cover-to-cover reading of all twenty-one volumes.

Appendix A is of no use in identifying the specific trade secrets at issue. Neither defendants nor this Court are required to sift through stacks of technical manuals and speculate as to what amorphous "concepts, designs, methods and processes" found within that [a] plaintiff may be seeking to protect.

*Id.* at 818.   The court similarly discussed Appendix B:

Appendix B is a forty-two page narrative. Like Appendix A, its subject matter significantly exceeds the nine trade secret areas set forth in the Supplemental Answer, and any discussions pertaining to said areas are scattered and incomplete. Discussion of certain trade secret areas as identified in the Supplemental Answer is wholly absent. The Court finds no explicit discussion of real time charge checking (area No. 3), account inquiry (area No. 6) or end user reminder notices (area No. 7). The appendix does contain discussion of heads down data entry (areas Nos. 2 & 4), batches (area No. 1), the tickler system (area No. 8), invoice level processing (area No. 5) and statements (area No. 9). However, these discussions do not distinguish between descriptions of the functionalities and their benefits and any descriptions of the concepts, designs, methods and processes that provide them. The narrative fails to explicitly identify any concepts, designs, methods or processes as trade secrets. Appendix B provides no new light on the identity of the trade secrets in this action.

The Court cannot begin to speculate on the identity of the trade secrets plaintiff is seeking to protect. IDX has produced an unnavigable amount of documentation and instructed the Court and defendants to find its trade secrets themselves. Plaintiff's position that everything in Appendix B is a trade secret until shown otherwise is no different than the approach, repeatedly rejected by the courts, that plaintiff can point to broad areas of technology and vaguely assert that something within is a trade secret. Long lists of general areas of information containing

10

unidentified trade secrets are not substitutes for particularized and concrete trade secrets.

*Id.* at 818–19 (internal citations omitted).

The district court concluded that summary judgment was warranted in favor of Epic on IDX's trade secret claim because IDX failed to identify a trade secret at any time during the litigation: "From plaintiff's vague and amorphous submissions it is impossible to determine whether plaintiff's information satisfies the statutory definition of trade secret. Plaintiff's claim fails for lack of particularized trade secrets and, accordingly, will be dismissed." *Id.* at 819.

Later, the court in *NEXT Payment Sols., Inc. v. CLEAResult Consulting, Inc.,* No. 1:17-cv-8829, 2020 WL 2836778 (N.D. Ill. May 31, 2020), was guided by *IDX* in determining whether the plaintiff, NEXT Payment Solutions, Inc. ("NEXT") identified a trade secret with the requisite specificity to survive defendant CLEAResult Consulting, Inc.'s ("CLEAResult") motion for summary judgment.

CLEAResult implemented residential energy efficiency programs for utilities. *NEXT Payment Sols., Inc. v. CLEAResult Consulting, Inc.,* No. 1:17-cv-8829, 2020 WL 2836778, at *1 (N.D. Ill. May 31, 2020). NEXT, a software company, provided customized development services and exclusive licensing rights to CLEAResult, who used this to "offer an online rebate-processing program to its utility company clients." *Id.* at *2. After the program was implemented, CLEAResult replaced NEXT's system with different software. *Id.* The parties disputed what capabilities the new software initially had upon CLEAResult's acquisition. *Id.* NEXT alleged that CLEAResult misappropriated its trade secrets in violation of the DTSA by adding "key functionalities" of its software program to CLEAResult's newly implemented system. *Id.* at *3. NEXT contended that CLEAResult could only have accomplished this once it had access to NEXT's program's source code, data encryption, web application, and the like. *Id.* at *2–3.

11

In its summary judgment memorandum opinion, the court noted that "NEXT has attempted several times to identify alleged trade secrets with the requisite specificity." *Id.* at *8. This included its answers to written discovery, responses to a motion to compel, a filed trade secret document, and responses to two motions for summary judgment. *Id.* The court homed in on NEXT's thirteen-page document entitled "Identification of Trade Secrets" and its accompanying brief. *Id.* In the document, NEXT describes 34 separate modules and 5 "combination" modules as its trade secrets. *Id.* at *9. Each description contained an explanation of the function of the module and a list of the other modules with which the module interfaced. *Id.* The court found that instead of narrowing or separating the trade secrets from their readily ascertainable functionality, NEXT's trade secret identification made the distinction "even murkier." *Id.* at *12.

Accordingly, the court held that these descriptions were insufficient at the summary judgment stage. It found that NEXT clung to "generalities," describing "what its alleged trade secrets *do*, not what they *are*." *Id.* at *13 (emphasis in original). The statements focused "on the function of each module, not the underlying, secret methods of accomplishing those functions." *Id.* at *14. Comparing NEXT's claim to that in *IDX*, the court stated: "NEXT comes to the summary judgment stage with an amorphous bog of alleged trade secrets. NEXT offers a broad description that leaves the audience wondering what, exactly, the supposed trade secrets are. Trying to pin down the trade secrets has the distinct feel of nailing jello to a wall." *Id.* at *13.

Here, as in *IDX* and *NEXT*, whether Danieli has adequately identified the trade secret(s) at issue has featured prominently in the parties' assessment of the viability of Danieli's claims. Danieli's alleged trade secret(s), like its theory of misappropriation, has shifted multiple times in the course of the almost 3 years since this case was filed. The first theory Danieli asserted was that the trade secret (singular) SMS misappropriated was Danieli's QSP-DUE caster technology.

Danieli then pivoted to a theory premised on more than one trade secret, including but seemingly not limited to, both the QSP-DUE as well as its original QSP caster technology.  Later, Danieli again shifted its focus and definitively stated that the technology proposed during the Shougang Jingtang proposal is the misappropriated trade secret (singular).  Danieli, however, ultimately abandoned this position and now ostensibly claims that SMS misappropriated multiple trade secrets.

First, in Danieli's original complaint, it focused on its QSP-DUE caster technology, alleging that this technology, "specifically the roll technology and mold configuration, constitutes a trade secret under 18 U.S.C. §1839(3)." (ECF No. 68, p. 19).  At that time, Danieli alleged that SMS misappropriated the QSP-DUE caster technology, through SDI, in the course of the bid, award, and construction process of Sinton. (*Id.* at 19, 21).

After engaging in some discovery, however, Danieli's theory changed.  It abandoned its allegations that SMS and SDI misappropriated the QSP-DUE caster technology in connection with the Sinton bid.  Danieli also, apparently, changed the theory of exactly what trade secret(s) was/were misappropriated—or at the very least—failed to identify which component(s) of its technology constitute its protected trade secret(s).

On August 19, 2022, Danieli filed its Amended Complaint. (ECF No. 171).  Contrary to its complaint, Danieli described a gradual misappropriation that occurred over a long period of time—rather than merely in the context of Sinton.  Moreover, Danieli shifted its language to describe trade secrets (plural), rather than one singular trade secret as described in the complaint:

> Through concerted efforts lasting more than a decade, SMS gained access to Danieli's vital trade secre**ts**. By 2009, having lost a series of bids around the world for casters and realizing that it was falling behind in the marketplace, SMS began a research and development project to design its own casters that could compete with Danieli's superior offerings.  The backbone of that project was Danieli's own technology.  As one of the primary goals of its research efforts, SMS systematically

> collected confidential, proprietary, and trade secret information about Danieli's
> caster technology, including Danieli's technical specifications, roll diagrams, and
> confidential communications with customers, and used that information to guide its
> development efforts.

(ECF No. 171, pp. 2–3) (emphasis added).  Counts II and III of the Amended Complaint still alleged that the QSP-DUE technology constitutes a trade secret, but Danieli added mention of its original QSP technology.  (*Id.* at 25–29).  Curiously, the phrasing of Counts II and III is seemingly inconsistent to an assertion of multiple trade secrets (plural).  Danieli pleads that its "proprietary QSP® *and* QSP-DUE® caster technology, specifically the roll technology and mold configuration, constitutes *a* trade secret" under the DTSA and PUTSA.  (*Id.* at 25, 27) (emphasis added).  In any event, as pled in the Amended Complaint, Danieli claimed that its trade secret (singular) was the QSP and QSP-DUE technology, or perhaps more narrowly, the roll technology and mold configuration that comprises those systems.

In the course of discovery, a dispute arose as to whether Danieli had adequately identified the trade secret(s) on which it pursues its misappropriation claims against SMS.  SMS served its Interrogatory Number 1 to Danieli asking Danieli to identify "with as much precision and specificity as possible, each [t]rade [s]ecret [a]t [i]ssue[.]"  (ECF No. 312, p. 7 (quoting ECF No. 307-2, p. 15)).  Danieli responded that "its trade secret**s** rest in the combination of [] roll technology elements in a given caster design for a high-speed, vertical-curved cast; i.e., the QSP® or QSP-DUE® roll diagrams proposed to or built for each of its customers."  (*Id.* (quoting ECF No. 307-2, p. 20) (emphasis added)).  Danieli also listed eight specific features of its alleged trade secrets (plural).  (*See id.* (citing ECF No. 307-2, p. 20)).

The Court subsequently held a status conference and oral argument on a number of discovery issues pending between the parties on May 25, 2023.  (ECF No. 304).  SMS argued that Danieli's description did not adequately identify a trade secret.  It expressed the dual concern that

14

(1) it could not adequately defend against Danieli's trade secret claim because it did not understand what trade secret(s) Danieli was claiming and (2) that Danieli's description of the trade secret was so nebulous that it would be a moving target up to and through trial—being malleable enough to evade SMS's factual and legal arguments.  (*See* ECF No. 307-2, pp. 7–11).  In its June 13, 2023, Memorandum Order, the Court ruled as follows:

> Danieli will provide SMS with a specific description of the trade secrets allegedly taken by SMS in a document titled "Trade Secret(s) at Issue."  Danieli will be bound by its description going forward, absent leave to amend on a showing of compelling cause.  The Court leaves for another day the question of whether Danieli's description is a sufficient articulation of a trade secret under prevailing law.

(ECF No. 312, p. 8).

Danieli responded to the Court's order and served its Trade Secret Statement upon SMS. (ECF No. 437-1); (ECF No. 436, p. 7); (ECF No. 462, pp. 18–19).  Like the forty-two-page Appendix in *IDX,* Danieli's Trade Secret Statement is a thirty-page document that purports to identify Danieli's trade secrets and also includes substantial legal argumentation with respect to factors underlying the elements of a trade secret under the DTSA.  Danieli couched the Trade Secret Statement in plural language—by its own terms purporting to identify trade secrets (plural). In its first sentence, the Trade Secret Statement says: "The Danieli Trade Secret**s** at issue reflect Danieli's proprietary information concerning its thin- and intermediate-slab caster designs that have been developed over 35 years and that its competitors should not have." (ECF No. 437-1, p. 4) (emphasis added).  Danieli then provides a broad enunciation of what its trade secrets (plural) at issue *include*:

> The Danieli Trade Secret**s** at Issue *include* the roll technology in Danieli's QSP and QSP-DUE casters, which *together with* the roll geometry and the secondary cooling of the roll and caster, form the heart of Danieli's technology.

(*Id.*) (emphasis added). The plain language of this articulation is ambiguous. On the one hand, it can be read narrowly to suggest that the roll technology in QSP and QSP-DUE "together with" the roll geometry and the secondary cooling of the roll and caster constitute the extent of Danieli's claimed trade secret (singular). On the other hand, it can also be read to suggest that these elements (the roll technology in QSP and QSP-DUE, roll geometry, and the secondary cooling of the roll and caster) are merely elements of a broader claim of what constitutes Danieli's claimed trade secrets (plural).

The Court deduces that Danieli intended the Trade Secret Statement to employ the broader reading. Danieli's language choices throughout the Trade Secret Statement lead to this conclusion. As an example, the heading of one section states "Danieli's Trade Secret**s** Involve Proprietary Combinations of Design Elements." (*Id.* at 5). In this section, Danieli sets forth a history of its purported attempts at identifying its trade secrets (plural) during this litigation and provides three additional statements of what its trade secrets (plural) at issue include:

> Danieli's Trade Secret**s** at Issue in this case arise in the precise combination of what equipment is selected, where it is located, and what the measurements are for that equipment—creating a unique combination from a plethora of design elements to achieve specific desired performance characteristics—which combination is neither public information nor general industry knowledge. Specifically, Danieli's Trade Secret**s** at Issue include the combinations of what rolls are selected (*i.e.*, the particular diameter, pitch, number of splits, and selections of idle vs. driven and solid-body vs. sleeve roll), where they are located (*i.e.*, the number and position of idle and/or driven rolls and the pitches between rolls), how they are arranged in segments throughout the caster (*i.e.*, the numbers and types of different segments throughout the caster), and how they are cooled—and the know-how to reach those decisions to meet a customer's requirements.

> Additionally, as described by Danieli's 30(b)(6) witness Mr. Gasparini (Dec. 16, 2022 Tr. at 30:6-52:4), Danieli's Trade Secret**s** at Issue include the technical specifications that accompany the roll diagram for each caster in Danieli's proposals to clients. In particular, Danieli's specifications provide information regarding:

- The casting speed and solidus length for different slab widths and sizes at
various exit thicknesses for a particular caster design;

- Calculations of bulging and strain on the slab.

This information and calculations embody Danieli's trade secret<u>s</u>, and are derived
using Danieli's proprietary technology and modeling programs, which incorporate
real-world data from Danieli's operating casters and cannot be reverse engineered.
Danieli's industry-leading experience with high-speed vertical liquid bending
casters uniquely distinguishes these calculations from what is known by others in
the industry.  These calculations, in part, allow Danieli to design casters capable of
meeting a customer's requirements.

(*Id.* at 5–8) (emphasis added).

Danieli clarifies that no single element of its articulation constitutes a trade secret: "For the

avoidance of doubt, Danieli has never claimed that any one aspect, in isolation—for instance, the

use of a particular roll diameter in a particular segment—constitutes a trade secret."  (*Id.* at 7).

This disclaimer further directs for an expansive reading of what Danieli is attempting to claim as

proprietary information in its Trade Secret Statement.  For example, it previously stated that its

trade secrets (plural) "include the roll technology in Danieli's QSP and QSP-DUE casters …

together with the roll geometry…," (*Id.* at 4), but no particular geometry is claimed as being a

trade secret.  Thus, the prefatory language in the Trade Secret Statement cannot be read as

identifying the particular roll geometry used in any particular construction of the QSP or QSP-

DUE casters at any particular plant.  Only in combination with all of Danieli's other technology

and know-how, and when this all is included in a particular Danieli project (but not necessarily

any single project), will there arise a trade secret under the articulation set forth in Danieli's Trade

Secret Statement.  Indeed, the articulation set forth in Section II of the Trade Secret Statement

could reasonably be construed as contending that while no specific proposed or constructed caster

design is Danieli's trade secret, every bespoke proposal or constructed caster constitutes its trade

secrets—or a combination of trade secrets inextricably intertwined with non-trade secret elements.

17

The Trade Secret Statement and its voluminous attachments do not make this clearer. Rather—it does the opposite. The Trade Secret Statement leaves the general reader, and the Court, unsure of what Danieli claims to be its actual trade secret(s) at issue in this case. This is exactly what the Court tried to avoid when ordering Danieli to reduce its trade secret(s) to writing.

As to specific caster proposals, Section V of the Trade Secret Statement represents that "The Trade Secret**s** at Issue Include Danieli's Proposal for Shougang Jingtang, Which SMS Misappropriated and Used for Its Sinton Bid[.]" (*Id.* at 13). Danieli then provides a number of specifications used for the Shougang proposal, including technical diagrams. (*Id.* at 13–17). In light of subsequent Danieli filings, it is critical to note that Danieli did not say that the Shougang proposal, or any specific element of it, *was* its trade secret, but rather, that the proposal was *included* in its trade secrets (plural).[4] Nothing in the Trade Secret Statement can be read to expressly limit Danieli's misappropriation claim theory to the Shougang proposal.

The Court is thus left with as many questions as it had prior to reading the Trade Secret Statement. The core purpose of the Court's June 13, 2023, Memorandum Order was to pin down exactly what trade secret(s) form(s) the basis of Danieli's trade secret misappropriation claims. The Court unequivocally specified that "Danieli will be bound by its description going forward, absent leave to amend on a showing of compelling cause." (ECF No. 312, p. 8). Nevertheless, the Trade Secret Statement does not seem to be Danieli's last word on what trade secret(s) it claims to have been violated. After SMS's Motion and supporting briefs launched a frontal attack on the sufficiency of the Trade Secret Statement, Danieli's Memorandum of Law in Opposition to SMS's Motion for Summary Judgment ("Opposition Brief") takes a position at odds with the description

---

[4] The Court notes that even in the Trade Secret Statement itself, Danieli explains that "[t]he combination of these elements in the Shougang roll design constitutes **a** Danieli trade secret, and a particular embodiment of the Trade Secret**s** at Issue in this action." (*Id.* at 14) (emphasis added).

in its Trade Secret Statement and states, for the first time, that the sole trade secret (singular) at issue in this litigation is the QSP1 caster proposed to Shougang Jingtang:

> SMS's main argument is that it implausibly still does not understand what it stole. Yet, Danieli has been clear and consistent in identifying the at-issue protectable trade *secret*: the technical documentation and roll diagram that it submitted to Shougang Jingtang (the "QSP1 design"). This is the information SMS misappropriated and used to construct its Sinton plant caster. There is no ambiguity that this design is the misappropriated trade *secret* specifically at issue here— Danieli's expert, Dr. Thomas, expressly defines Danieli's Shougang proposal as the "Misappropriated Danieli Design," and SMS's own experts, Mr. Jarosz and Dr. Cramb, acknowledge that design in their rebuttal reports. Nor is there any ambiguity about the evidence substantiating SMS's possession and use of the QSP1 design during the Sinton bid at the crux of this case, as both Dr. Thomas's report and Danieli's Trade Secret Statement identify specific documents in SMS's files which contain the identified trade *secret* and reflect how SMS used the information during the Sinton bid.

(ECF No. 463, p. 7) (emphasis added) (internal citations omitted). Shortly thereafter, Danieli reiterates its narrowed articulation of its alleged trade secret (singular):

> Although discovery has shown that the QSP1 design is not the only one SMS wrongfully acquired and used—and SMS's pattern and practice of misconduct is both probative of its misappropriation and relevant to Danieli's unjust enrichment claim—it was Danieli's QSP1 Shougang design that SMS used during the Sinton bid. *That is why it alone is the focus of Danieli's trade secret claim.*

(*Id.* at 7–8) (emphasis added). Danieli's substantive argument then focuses upon the portions of its Trade Secret Statement that purported to illustrate the specifications of the QSP1 design that were the basis of the Shougang proposal. (*Id.* at 10–15). Danieli's Opposition Brief is not ambiguous. It claims that the Shougang QSP1 design "alone" is the focus of its misappropriation claims. (*Id.* at 8).

Even affording it every benefit of the doubt, Danieli's description of the trade secret in its Opposition Brief is irreconcilable with the Trade Secret Statement, which suggests the existence of multiple trade secrets and uses the Shougang proposal, at most, as an illustration of one of these trade secrets. Specifically, where the Trade Secret Statement is couched in terms of trade secret**s**

(plural),[5] Danieli's Opposition Brief is framed only in singular terms.[6]  The trade secrets (plural) purportedly identified in the Trade Secret Statement "*include* the roll technology in Danieli's QSP and QSP-DUE casters, which together with the roll geometry and the secondary cooling of the roll and caster, form the heart of Danieli's technology."  (ECF No. 437-1, p. 4).  But Danieli's Opposition Brief mentions only the QSP1 caster from the Shougang design. (*See generally* ECF No. 463).  It makes no mention of the QSP-DUE.  Thus, while the Opposition Brief identifies the QSP1 caster in the Shougang design as being its sole trade secret at issue, its Trade Secret Statement only uses the Shougang design as an illustration of Danieli's trade secrets (plural).[7] Even here, at the summary judgment stage, Danieli's theory as to what trade secret(s) lay at the heart of its claims continues to shift.

The malleable nature of Danieli's identification of its alleged trade secret(s) was emphasized at the June 21, 2024, oral argument ("Oral Argument") on the pending motions for summary judgment between Danieli and SMS.  (ECF No. 512).  Danieli took no fewer than 3 positions during the hearing as to what it claims constitutes the trade secret(s) at issue in this case. First, Danieli emphasized its commitment to the Shougang-alone theory offered in its Opposition Brief.  However, when prompted to commit to Shougang's roll diagram reproduced in its Trade Secret Statement, Danieli sought to expand its claimed trade secret(s),[8] by reverting to its original,

---

[5] The "Trade Secret**s** at Issue…"  (ECF No. 437-1, pp. 4–8, 10–14, 23–25, 27, 29, 31–32).

[6] "[Danieli's QSP1 Shougang design] alone is the focus of Danieli's trade secret claim."  (ECF No. 463, p. 8).

[7] "The Trade Secret**s** at Issue *Include* Danieli's Proposal for Shougang Jingtang, Which SMS Misappropriated and Used for Its Sinton Bid."  (ECF No. 437-1, p. 13) (emphasis added).

[8] "THE COURT: … So your position then is notwithstanding the lengthy document here, the real key, what I should really understand and view as the trade secret that Danieli has proffered before me, is Page 12 of the Trade Secret Statement?  MS. SCHNEIDER: Yes, but.  So yes.  The only

amorphous position that (1) the Trade Secret Statement details every trade secret Danieli claims to possess (not necessarily the trade secret(s) at issue in this case),[9] (2) the appendix attached to the Trade Secret Statement is every piece of proprietary information that SMS allegedly took from Danieli, and (3) Danieli is prepared to go to trial on all of the trade secrets contained therein.

As to Danieli's first position, it acknowledged that the Shougang-alone theory differs from the articulation of the multiple trade secrets set forth in the Trade Secret Statement. (*Id.* at 25–26) (explaining that each caster is a trade secret and the Trade Secret Statement encompasses the "body" of Danieli's trade secrets). It contends that the narrowing in its Opposition Brief (without leave of Court) was done for the convenience of the Court and jury. (*Id.* at 28.).

Danieli then specified that the Shougang roll diagram reproduced at page 12 of the Trade Secret Statement represented the trade secret that it thought "ma[de] sense under the DTSA to try at trial." (*Id.*). When the Court asked whether Danieli would commit to that page, Danieli responded "yes, but…" and proceeded to hedge to avoid a firm commitment. (*Id.* at 35–37, 53–54). Later in the proceeding, Danieli contended that the material on pages 12, 13, and 14 of the Trade Secret Statement was the trade secret (singular) at issue in this case. (*Id.* at 53). There are clear problems with this shift, including the plain language used on page 13 which purports that the design submitted to Shougang is to illustratively serve as a "non-exhaustive example" of

---

reason that we wanted to provide all the context is this wasn't taken in a vacuum. So it's not like SMS had been developing technology itself for 20 years and they got this one piece of paper and they said, We can make a little tweak on this one piece of paper. They had been taking Danieli's stuff for ten years, and we wanted to put that in the Trade Secret Statement." (ECF No. 534, pp. 35–36).

[9] Danieli represented that its Trade Secret Statement was intentionally drafted broadly so as to preserve its ability to claim a broader universe of trade secrets. (ECF No. 534, p. 32) ("[W]e were also trying to be very careful not to be precluded later, because we know we are bound by this [Trade Secret Statement]."). But the time to hedge and strategically shift theories has long since passed.

"Danieli's trade secret**s** [that] were copied into SMS's own documents for use during the SDI bidding." (ECF No. 437-1, p. 16). Moreover, page 14 is actually an SMS-created document that Danieli identified in discovery. (ECF No. 534, pp. 53–55). The pages cited by Danieli, by their own language, do not support Danieli's narrowed definition. Perhaps sensing the Court's puzzlement at its attempts to articulate the trade secret(s) at issue, Danieli offered to abandon its Shougang-only theory and to go to trial on the admittedly broader Trade Secret Statement as a whole. (*Id.* at 56–59) ("We don't have to narrow, Your Honor. I mean, we can go to trial on all of these. We could take this Trade Secret Statement and go to trial tomorrow.").

Even at this stage of the case, Danieli seeks to avoid being "pinned down" by its Trade Secret Statement, but this is exactly what the Court-ordered Trade Secret Statement was designed to avoid. Danieli was ordered to provide a "specific description of the trade secrets allegedly taken by SMS" and was explicitly informed that it would "be bound by its description going forward, absent leave to amend on a showing of compelling cause." (ECF No. 312, p. 8). As explained above, the Trade Secret Statement offered a less than clear articulation of what Danieli claims to be its trade secret(s) at issue in this case. In fact, it is as clear as mud and every bit as malleable. It identified a number of features of its technology and processes that may be included in its trade secret(s) but avoided being pinned down by never unequivocally stating that any specific technology or process *is/are* its trade secret(s) pertinent to its claims in this litigation. As in *NEXT*, the Trade Secret Statement clarifies nothing, but rather made the identification "even murkier." 2020 WL 2836778 at *12. The Trade Secret Statement does not identify a trade secret with sufficient particularity to survive summary judgment as a matter of law. *See Mallet*, 16 F.4th at 381 n.19.

Danieli's late pivot to the Shougang-alone theory cannot save its claims. Danieli's attempt to shift its position fails for two reasons: (1) Danieli never sought leave to amend its Trade Secret Statement to pursue the Shougang-alone theory notwithstanding the plain language of the Court's Order and (2) that theory is not a tenable articulation of what trade secret(s) are at issue in this case.

Related to the first point, as discussed above, the Court ordered Danieli to create and serve its Trade Secret Statement over a year ago to avoid the precise situation that has arisen—one where Danieli continues to shift the focus of its claims, keeping SMS and the Court from a clear understanding of the trade secret(s) which form the basis of this action. Since the Court's June 13, 2023, Memorandum Order, Danieli has been on notice that it will be constrained to the four corners of its Trade Secret Statement absent leave of Court. Danieli never asked for leave to amend its Trade Secret Statement to pursue its Shougang-alone theory. Rather, it did exactly what the Court's Order was designed to prevent. Danieli pivoted from the broad identification proffered by the Trade Secret Statement to the Shougang-alone theory presented, for the first time, in its Opposition Brief. Moreover, it made the switch after SMS already focused its attack on the alleged identification(s) in the Trade Secret Statement. Further, Danieli's performance at Oral Argument highlighted its refusal to be pinned down about the fundamental question of which trade secret(s) is/are at issue. However, as the Court expressly ruled in its June 13, 2023, Memorandum Order, Danieli is bound by its Trade Secret Statement and, therefore, will not be permitted to shift to the Shougang-alone theory or any of the permutations presented at Oral Argument.

On the second point, even if the Court were to allow Danieli to make the late switch to the Shougang-alone theory, Danieli would run into the same problem as discussed above related to its trade secret(s) generally—Danieli does not state with the requisite specificity exactly what

component(s) of its Shougang proposal constitute(s) a trade secret or trade secrets. Even if the Court were to consider the narrow proffer from Oral Argument that pages 12-14 of the Trade Secret Statement (ECF No. 437-1, pp. 15–17) embody Danieli's Shougang-alone theory, those pages themselves would also be insufficient. They do not answer any of the questions that remain as to the identification of Danieli's trade secret(s). Specifically related to the diagram on page 12, does Danieli claim that each and every datum contained therein is a trade secret? If not, Danieli must separate its claimed proprietary information "from matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade…." *Mallet*, 16 F.4th at 382 (citation omitted). Danieli fails to do this, and instead, "[w]ith a wave of the hand, it declares everything to be secret know-how." *Id.* at 383.

Relatedly, as discussed above, the language employed on page 13 of the Trade Secret Statement details that the list of particulars set forth is merely a "non-exhaustive example," not *the* trade secret. (ECF No. 437-1, p. 16). So, if the Court were to understand that the itemized list on page 13 is *the* trade secret, does that mean that all of the remaining information are matters of general knowledge in the trade and/or special knowledge of those skilled in the trade? The fact is that Danieli's pivot to the Shougang-alone theory struggles with the same problem as Danieli's Trade Secret Statement—it does not identify to the required degree of specificity exactly what element(s) of the Shougang proposal is a trade secret and what is not.

It is well established that a trade secret plaintiff is held to a higher standard at the summary judgment stage than it was at the pleading or discovery stage. Indeed, at summary judgment, a plaintiff has to "put up or shut up." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006). A plaintiff does not have to prove its case at summary judgment, but it has to show there is a case to prove. In a trade secret case, this requires the identification of a trade secret. Nearly

three years after this litigation was initiated, the Court is still unclear as to what trade secret(s) Danieli is claiming SMS misappropriated to give rise to this action. The Court attempted to ensure clarity by ordering Danieli to create the Trade Secret Statement. As explained above, the document does not clearly identify the specific trade secret(s) Danieli is pursing in this case. The waters were further muddied by Danieli's switch to the Shougang-alone theory in its Opposition Brief and its shifting articulations of that theory at Oral Argument.

At this late stage in the litigation, the only thing clear about Danieli's trade secret misappropriation theory is that it is unclear and remains evasive. Danieli, like the plaintiff in *NEXT*, "comes to the summary judgment stage with an amorphous bog of alleged trade secrets … that leaves the audience wondering what, exactly, the supposed trade secrets are." 2020 WL 2836778 at *13. Danieli has tasked the Court with "nailing jello to a wall" in attempts to pin down Danieli's at-issue trade secret(s). *Id.* But it was Danieli's job to clearly articulate the trade secret(s) at issue in this case. It is not the Court's job to parse through its shifting statements to discern what trade secret(s) may form the basis of its claims. Because Danieli has failed to identify its trade secret(s) with the requisite specificity, summary judgment is warranted in favor of SMS on Danieli's trade secret claims.

**B.     Danieli's unjust enrichment claim is untenable and fails as a matter of law.**

SMS also moves for summary judgment on Danieli's unjust enrichment claim. According to SMS, an unjust enrichment claim is one sounding in quasi-contract, is an equitable substitute for a contract, and cannot be maintained absent a relationship akin to a contract. (ECF No. 435, pp. 29–31). Even if the Court were to recognize a stand-alone unjust enrichment cause of action, SMS asserts that such a claim cannot proceed because the claim rises or falls with Danieli's primary trade secret misappropriation claims, both of which fail. (*Id.* at 31–32). Danieli counters

that it is "black-letter law that Pennsylvania recognizes unjust enrichment outside of the quasi-contractual context," specifically for claims which sound in tort. (ECF No. 463, p. 29). It asserts that such a claim can be brought either as a companion to its trade secret misappropriation claims or as a stand-alone tort. (*Id.* at 29–31). Thus, Danieli contends that it should be able to independently pursue its unjust enrichment claim regardless of whether its misappropriation claims fail. The Court holds that, as pled and pursued, Danieli's unjust enrichment claim fails as a matter of law.

Pennsylvania courts have long recognized that unjust enrichment is a quasi-contractual theory of liability by which the claim is asserted as an equitable alternative to a breach of contract claim. As such, unjust enrichment claims may be pled as an alternative to a breach of contract claim when they are based on a quasi-contractual theory. *Lugo v. Farmers Pride, Inc.*, 967 A.2d 963, 970, 970 n.5 (Pa. Super. 2009). Quasi-contractual theories usually involve circumstances where the "plaintiff seeks to recover from [the] defendant for a benefit conferred under an unconsummated or void contract." *Steamfitters Local Union No. 420 Welfare Fund v. Phillip Morris, Inc.*, 171 F.3d 912, 936 (3d. Cir. 1999) (citations omitted). Accordingly, the unjust enrichment doctrine is not applicable where an express contract exists between the parties. *Joyce v. Erie Ins. Exch.*, 74 A.3d 157, 169 (Pa. Super. 2013) (citing *Mitchell v. Moore*, 729 A.2d 1200, 1203 (Pa. Super. 1999)).

Danieli does not assert its unjust enrichment claim as an alternative to a claim for breach of contract, nor does is it ever assert that it is pursuing a quasi-contractual theory of recovery. Rather, by emphasizing Pennsylvania case law that recognizes an additional theory on which a claim of unjust enrichment may be pursued—one sounding in tortious conduct—Danieli concedes that its unjust enrichment claim is based in tort. (*See* ECF No. 463, pp. 29–31).

Danieli asserts that it is able to pursue an unjust enrichment claim grounded in tort because "it is black-letter law that Pennsylvania recognizes unjust enrichment outside the quasi-contractual context." (*Id.* at 29). To demonstrate this, Danieli first contends that "Pennsylvania has adopted the Restatement of Restitution, which explicitly specifies that unjust enrichment can occur through 'interference with a trade secret.'" (*Id.*) (internal citation omitted). It also cites to a handful of federal and state cases that address the vitality of an unjust enrichment claim in the tort context. (*Id.* at 29–30). The Court concludes that (1) Pennsylvania courts have not "adopted" provisions of the Restatement of Restitution allegedly recognizing a cause of action for unjust enrichment in the trade secret context and (2) the cases cited by Danieli actually demonstrate why its unjust enrichment claim fails.

On the first point, Danieli's argument is wrong. Pennsylvania courts have *not* "adopted" any portion of the Restatement of Restitution that would serve as "black-letter law" establishing that there is a stand-alone cause of action for unjust enrichment outside of the quasi-contractual context—much less a cause of action specifically tailored to trade secrets. Danieli curiously cites to a Pennsylvania Supreme Court case from 1990, *D.A. Hill Co. v. Clevetrust Realty Invs.*, 573 A.2d 1005, 1009 (Pa. 1990), to demonstrate that "Pennsylvania has adopted the Restatement of Restitution." (ECF No. 463, p. 29). However, the provision of the Restatement that Danieli relies upon, § 42 (dealing with "Interference with Intellectual Property and Similar Rights"), is part of the Restatement (Third) of Restitution that was published in 2011. Moreover, the court in *D.A. Hill* did not purport to "adopt" the Restatement (First) of Restitution in its entirety—much less the yet-to-be-authored Third Restatement—but merely applied § 110 of the First Restatement, which applies to the situation where a third-party benefits from a contract entered into between two other

parties. *D.A. Hill Co. v. Clevetrust Realty Invs.*, 573 A.2d 1005, 1009 (Pa. 1990) (quoting *Meehan v. Cheltenham Twp.*, 189 A.2d 593, 596 (Pa. 1963)). This has no application to the case at bar.

Additionally, as a general matter, Danieli's argument misstates the role of the Restatements in American jurisprudence. The Pennsylvania Supreme Court explained that the Restatements are intended to do just as their names imply—restate and summarize the prevailing common law governing a topic. However, the "adoption" of a portion or portions of a Restatement cannot be read in a manner that is "unmoored" from or contravenes existing common law:

> Restatements of law published by the American Law Institute purport to offer a synthesis of American common law, which articulates the reasoned, mainstream, modern consensus on principles of broad application intended to govern large numbers of cases. Consistent with its adjudicative rather than policy-making role, the Court has "adopted" or deemed sections of a restatement a proper statement of Pennsylvania law if the cause of action and its contours are consistent with the nature of the tort and Pennsylvania's traditional common law formulation. In this sense, the adoption of a restatement formulation intended to advance the law cannot be so unmoored from existing common law and produce such a policy shift that it amounts in actuality or public perception to a derogation of legislative authority, and the concomitant suggestion that such authority is reposed in the Judiciary or in the American Law Institute.

*Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 353–54 (Pa. 2014) (internal citations omitted). The Pennsylvania Supreme Court further observed that

> because the language of a provision of the restatement, even to the extent it was adopted by the Court *verbatim*, has not been vetted through the crucible of the legislative process, a court applying the restatement formulation should betray awareness that the language of an "adopted" restatement provision is not "considered controlling in the manner of a statute." A given restatement section simply states principles of the common law, general rules whose validity depends on the reasoning that supports them.

*Id.* at 354 (emphasis in original) (quoting *Coyle by Coyle v. Richardson–Merrell, Inc.*, 584 A.2d 1383, 1385 (Pa. 1991)). In other words, Restatements are not to be treated as uniform statutes. They merely restate the existing common law of a jurisdiction or represent a development of that common law based on the generally applicable common law principles. A court's citation—as

Danieli focuses upon here—of a provision of a Restatement, even when formally "adopted" must still be cabined by the body of a jurisdiction's established common law. In no instance is the citation to, or even adoption of, one provision of a Restatement an indication that each section of that Restatement comprehensively represents the law of that jurisdiction. In this case, Danieli's contention that Pennsylvania has adopted provisions of the Restatement (Third) of Restitution—which Danieli cites to support its claim that a stand-alone claim for unjust enrichment is available in the trade secret context—is untenable.

The next question, separate and apart from the Restatement, is whether Pennsylvania courts have recognized a cause of action for unjust enrichment outside of the quasi-contractual setting. Danieli has not cited a single Pennsylvania case that squarely recognizes a stand-alone cause of action for a tort-based unjust enrichment claim. It cites a handful of federal cases applying Pennsylvania law which it construes as recognizing such a claim. (ECF No. 463, pp. 29–30). But these cases do not salvage Danieli's claim.

In *Zafarana v. Pfizer, Inc.*, 724 F. Supp. 2d 545, 560 (E.D. Pa. 2010) (internal citation omitted), the district court unequivocally stated that Pennsylvania law treats unjust enrichment as a form of quasi-contractual liability that will not substitute for an unsuccessful tort claim: "As in New Jersey, unjust enrichment is not a substitute for failed tort claims in Pennsylvania, but, instead will generally be used to imply quasi-contract liability." *Zafarana* thus does not support Danieli's unjust enrichment theory.

The district court in *Whitaker v. Herr Foods, Inc.*, 198 F. Supp. 3d 476 (E.D. Pa. 2016), came the closest to recognizing that an unjust enrichment claim may relate to tortious, in addition to quasi-contractual, conduct. Nevertheless, *Whitaker* does not support the contention that such a claim can be maintained independently if the underlying tort claim fails. The Court stated:

> Unjust enrichment claims under Pennsylvania law appear to fall into one of two categories: (1) a quasi-contract theory of liability, in which case the unjust enrichment claim is brought as an alternative to a breach of contract claim; or (2) a theory based on unlawful or improper conduct *established by an underlying claim*, such as fraud, in which case the unjust enrichment claim is a companion to the underlying claim.

*Whitaker v. Herr Foods, Inc.*, 198 F. Supp. 3d 476, 492 (E.D. Pa. 2016) (emphasis added).[10]   The

court went on to explain what it characterized as the "second theory" of unjust enrichment:

> With respect to the second theory, an unjust enrichment claim may be pled as a companion, not an alternative, to a claim of unlawful or improper conduct as defined by law—e.g., a tort claim. "In the tort setting, an unjust enrichment claim is essentially another way of stating a traditional tort claim (i.e., if defendant is permitted to keep the benefit of his tortious conduct, he will be unjustly enriched)." *Where the unjust enrichment claim rests on the same improper conduct as the underlying tort claim, the unjust enrichment claim will rise or fall with the underlying claim.*   In other words, unlike the quasi-contract theory of unjust enrichment, which acts as an equitable stand-in for a failed breach of contract claim, *an unjust enrichment claim based on wrongful conduct cannot stand alone as a substitute for the failed tort claim.*

*Whitaker*, 198 F. Supp. 3d at 493 (emphasis added) (internal citations omitted); *M3 USA Corp. v.*

*Hart*, 516 F. Supp. 3d 476, 505 (E.D. Pa. 2021); *see also Symphony FS Ltd. v. Thompson*, No.

5:18-cv-3904, 2018 WL 6715894, *10 (E.D. Pa. Dec. 20, 2018) (stating "an unjust enrichment

claim may be pled as a companion, not an alternative, to a tort claim").

   In *Steamfitters Loc. Union No. 42 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 936–

37 (3d Cir. 1999), the Third Circuit discussed the inability of a party to pursue a tort-based theory

of unjust enrichment after the failure of the underlying tort claim.   The court highlighted the fact

that, while it may be a basis for recovery of damages akin to restitution, it is not a stand-alone

---

[10] The court cited *Zafarana*, 724 F. Supp. 2d at 561, in support of this proposition, as well as the Superior Court of Pennsylvania's decision in *Torchia v. Torchia*, 499 A.2d 581, 582 (Pa. Super. 1985).   Curiously, while the Superior Court's decision in *Torchia* reiterates the basic elements of an unjust enrichment claim, it cannot be read as recognizing a tort-based unjust enrichment cause of action.   *See Torchia v. Torchia*, 499 A.2d 581, 582–83 (Pa. Super. 1985).   The claim arose in the contractual context, centering around an insurance policy.   *Id.* at 582.

cause of action: "In the tort setting, an unjust enrichment claim is essentially another way of stating a traditional tort claim (i.e., if defendant is permitted to keep the benefit of his tortious conduct, he will be unjustly enriched)." *Steamfitters.*, 171 F.3d at 936; *see also Symphony FS Ltd.*, 2018 WL 6715894 at *10 ("In that case, the unjust enrichment seeks to recover a benefit the defendant gained by committing the tort."). Before discussing "the tort setting," the Third Circuit recognized that "[u]njust enrichment is typically invoked in a question setting, when [a] plaintiff seeks to recover from [a] defendant for a benefit conferred under an unconsummated or void contract." *Steamfitters*, 171 F.3d at 936.

The Third Circuit in *Steamfitters* then held that a plaintiff cannot proceed on his or her unjust enrichment claim once a district court properly dismisses the companion tort claim because of the "remoteness" between a plaintiff's injuries and a defendant's wrongdoing. *Id.* at 937. The court came to this conclusion based on the language found in two sections of the Restatement of Restitution. The first is in comment (a) of § 3 stating:

> The desirability of permitting restitution in [tort] cases is ordinarily not so obvious as in the cases where there has been no tort since the tortfeasor is always subject to liability in an action for damages and ... the right to maintain an action for restitution in such cases is largely the product of imperfections in the tort remedies, some of which imperfections have now been removed.

*Id.* at 936–37 (alterations in original) (citing Restatement of Restitution § 3 cmt. a (1937)). The court also quoted language from the Restatement's introductory note in chapter 7: "Actions of tort are ordinarily not restitutionary.... They are based primarily upon wrongdoing and ordinarily, through the payment of money, compensate the injured person for the harm suffered by him as a result of the wrongful conduct, irrespective of the receipt of anything by the defendant." *Id.* at 937. The court's discussion about how unjust enrichment applies in a tort-based context does not

cite a single Pennsylvania authority that addresses whether, and in what context, there can be an unjust enrichment claim outside the traditional contractual realm.

*Steamfitters*, along with the district court cases relied upon by Danieli, appear on the one hand, to presume that Pennsylvania recognizes unjust enrichment in broader contexts than just in contractual/quasi-contractual settings.  However, on the other hand, they unanimously agree that an unjust enrichment claim cannot survive if a claim for the underlying misconduct has been dismissed.[11]

*Steamfitters*, *Whitaker*, and *Zafarana* recognize that a tort-based claim for unjust enrichment cannot stand alone following the failure of the substantive tort.  Here, the underlying misconduct asserted by Danieli was the misappropriation of its trade secret(s) in violation of federal and state law.  As the Court held above, these claims fail because Danieli cannot specifically identify the trade secret(s) upon which its claims is/are based.  Danieli may not, consistent with the very cases it cites, salvage its failed claims by recasting them as one for unjust enrichment.  SMS's Motion will, therefore, be granted and Danieli's unjust enrichment claim against SMS will be dismissed.

---

[11] Pursuant to the language in *Steamfitters*, the Court will presume, *dubitante*, that Pennsylvania's state courts recognize the possibility of an unjust enrichment claim from tort-based conduct.  The Court wonders whether the language in *Steamfitters* and Danieli's cited district court opinions accurately reflects the practice of Pennsylvania state courts—especially in light of the decision of the Third Circuit in *Boring v. Google, Inc.*, 362 F. App'x 273 (3d Cir. 2010).  Albeit not precedential, *Boring* convincingly states that "[a]n unjust enrichment 'claim makes sense in cases involving a contract or quasi-contract, but not, as here, where plaintiffs are claiming damages for torts committed against them by [the] defendant[].'"  *Boring v. Google, Inc.*, 362 F. App'x 273, 282 (3d Cir. 2010) (alterations in original) (citation omitted).  As discussed, however, the resolution to this question is immaterial to the Court's decision because Danieli's companion claims—its two claims for trade secret misappropriation—fail as a matter of law.

## V.    CONCLUSION

For these reasons, SMS's Motion for Summary Judgment will be granted.  Counts II, III, and IV of Danieli's Amended Complaint will be dismissed as asserted against SMS.  An Order of Court will follow.

BY THE COURT:

WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

8/13/24
Dated

33