IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DANIELI CORPORATION and DANIELI &
C. OFFICINE MECCANICHE S.P.A.,

*Plaintiffs*,

v.

SMS GROUP, INC., SMS GROUP GMBH,
and STEEL DYNAMICS, INC.,

*Defendants*.

Civil Action No. 2:21-cv-1716

Hon. William S. Stickman IV

## MEMORANDUM OPINION

WILLIAM S. STICKMAN IV, United States District Judge

### I.    INTRODUCTION

Plaintiffs Danieli Corporation and Danieli & C. Officine Meccaniche S.p.A. (collectively "Danieli") filed a four-count amended complaint ("Amended Complaint") against Defendants SMS Group, Inc. and SMS Group GMBH (collectively "SMS") and Steel Dynamics, Inc. ("SDI"). (ECF No. 171). In response, SMS asserted five counterclaims against Danieli. (ECF No. 188). SMS brought claims for unfair competition (Count I), unjust enrichment (Count II), tortious interference with contractual relations (Count III), tortious interference with prospective contractual relations (Count IV), and abuse of process (Count V). (*Id.* ¶¶ 130-68).

Pending before the Court is Danieli's Motion for Summary Judgment Against SMS ("Motion") as to all of SMS's counterclaims asserted against Danieli.[1] (ECF No. 441). For the following reasons, Danieli's Motion will be denied. Specifically, Counterclaims I and IV will

---

[1] SMS informed the Court at the June 21, 2024, oral argument that it would not be pursuing its unjust enrichment claim. (ECF No. 534, p. 51). Accordingly, the Court will only consider Danieli's Motion as asserted against SMS's four remaining counterclaims.

proceed to trial because these claims are replete with disputed issues of fact that must be submitted to a jury. Likewise, as to Counts III and V, the Court holds that issues of fact preclude a finding that Danieli's actions are protected by the *Noerr-Pennington* doctrine.

## II.    FACTUAL BACKGROUND

The facts relevant to SMS's counterclaims generally arise from two occurrences—alleged misconduct by Danieli in 2015 through 2016 in connection with a bid for a steel plant in China and, in 2021, Danieli's decision to initiate this litigation by filing its complaint against SMS and SDI alleging, *inter alia*, misappropriation of its trade secrets. While there is some agreement between the parties, for the most part, the facts are hotly contested.

It is undisputed that from 2015 to 2016, Danieli and SMS proposed competing bids to a steel manufacturer in China named Shougang Jingtang ("Shougang") to supply Shougang with a steel slab caster. (ECF No. 445, ¶ 7); (ECF No. 454, p. 12). SMS submitted a joint bid with POSCO. (ECF No. 445, ¶ 8); (ECF No. 454, p. 12). It is undisputed that POSCO had an early relationship with Danieli for the development of technology called the "CEM Caster." (ECF No. 445, ¶¶ 1-5). The parties further agree that, as a general matter, POSCO was responsible for the caster roll diagram and SMS was responsible for all other equipment, though SMS and Danieli dispute the degree of SMS's involvement in the creation of the roll diagram. (ECF No. 445, ¶ 8); (ECF No. 454, p. 12).

Danieli's proposed roll diagram for Shougang was entitled "QSP1." (ECF No. 445, ¶ 9); (ECF No. 454, p. 13). Danieli contends that its proposal resulted from "three decades of experience with designing, building, and commissioning high speed VLB casters." (ECF No. 445, ¶ 10). SMS counters that Danieli's QSP1 roll diagram derived from well-known design principles. (ECF No. 454, p. 13). After submitting its roll diagram to Shougang, on or about February 26, 2016,

2

Andrea Carboni ("Carboni"), Danieli's then-chief technology officer, met with Mr. Yang, the project manager for Shougang, to discuss Danieli's proposal. (ECF No. 445, ¶ 12); (ECF No. 454, p. 15). During the meeting, Mr. Carboni learned more about Shougang's preferences, specifically that it sought a design that prioritized improving bulging control, even at the expense of roll life and maintenance costs. (ECF No. 445, ¶ 13); (ECF No. 454, p. 15). That same day, Mr. Carboni emailed two Danieli engineers to instruct them to prepare an updated roll diagram for Shougang. (ECF No. 445, ¶ 15); (ECF No. 454, p. 17). That email stated:

Today we discussed with Mr Yang the concept of our Roll Diagram for DUE.
In principle they understand and appreciated the modification we did compared with original CEM .
We are in the right direction, but as expected they told us that POSCO did deeper modification to solve the problem of the caster.
Of course spreading shit on Danieli .( true or not POSCO is believed as the GOD!)
And they are worried if we do not do the same.
In conclusion , after a long and political discussion , we agreed to be open to consider any suggestion and include it after a technical evaluation in our solution.
Customer is happy and finally they started to pass us some sensitive information about what they got from POSCO . Not numbers but concepts because POSCO did not give them any details.
This is strictly confidential !!!
And this is also a confirmation that they want to go on with US.
In conclusion they are asking to :

1. Improve bulging in top zone and bender.
2. To use 3 set of roll diameter/pitch in segment 1- 6  instead of 2 sets ( 3 types of segment instead of two)
3. They acknowledge that this requires more maintenance and more spares, but they accept

So we have to :

1. Reconsider the pitch and pitch in bender. Bulging has to be lower than CEM . TO use more span for load distribution and harder material for shaft and support . (Lee please advise )
2. To consider three types of segment in bow ( 1-2  , 3-4,  5-6)
3. ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄
4. Bulging has to be lower than CEM  ( original D&C) in all the metallurgical length in the bow , lower equal in horizontal part.
5. To reduce driven roll diameter to smooth down the peaks of bulging due to the different diameters.

It is clear that there will be some compromise on safety factors and lifetime but:

1. SGJT gives priority to technology
2. WE did not give guarantees on life of roll/bearing

Please prepare  the new Roll Diagram by next Monday /Tuesday.
In the presentation we need also to include a description on how we calculate bulging, strain and loads.
We promised the submission but Thursday next week .
I will be back in Beijing to discuss it . BAF organize yourself to be with me Thursday/Friday next week.

Thanks

Andrea Carboni

(ECF No. 447-19, p. 4). Over the next three days, the Danieli engineers created the "QSP2" roll diagram. (ECF No. 445, ¶ 16); (ECF No. 454, p. 17). SMS believes that this email demonstrates that Shougang passed information relating to the SMS/POSCO bid to Danieli. (ECF No. 454, pp. 15-17). SMS contends that Danieli then used SMS's information to redesign its own submission in only two days to be more desirable to Shougang. (*Id.* at 14-20). Danieli, on the other hand,

acknowledges that it was passed "sensitive information," but claims that this information related only to where its existing bid was ranked by Shougang. (ECF No. 445, ¶ 19).

In SMS and POSCO's jointly submitted proposal, they included a "fake" or "for reference" roll diagram. (ECF No. 445, ¶ 48); (ECF No. 454, pp. 26–27, 32). An "actual" design was created for the Shougang bid, but SMS and POSCO attempted to ensure that the details of this design were not entirely disclosed to Shougang. (ECF No. 445, ¶¶ 48-53); (ECF No. 454, pp. 26–36). A key fact in dispute is whether Danieli possessed SMS and POSCO's actual design prior to developing its QSP2. (ECF No. 445, ¶ 55); (ECF No. 454, pp. 36–37). Danieli claims it could not have received the actual SMS/POSCO design because Shougang had only received a fake design. (ECF No. 445, ¶¶ 55-58). However, SMS contends that Shougang, in fact, had the real roll diagram because, in September 2015, POSCO had inadvertently sent the real roll diagram information to Shougang. (ECF No. 454, p. 18). Further, SMS and POSCO previously showed Shougang its real roll geometry during an in-person meeting. (*Id.* at 19). Thus, SMS contends that Shougang was in possession of SMS and POSCO's actual roll diagram in advance of Mr. Yang's meeting with Mr. Carboni. (*Id.* at 20). It is undisputed that Shougang awarded the bid to Danieli. The parties sharply dispute whether Danieli's proposal resulted from its own development and redevelopment, or from copying the SMS/POSCO submission.

The next relevant events occurred five years later and involve Danieli's decision to initiate this litigation. These facts, as a general matter, relate to SMS and Danieli's competition on another bid, this one for the construction of a steel caster at SDI's facility in Sinton, Texas. SMS was awarded the bid to construct the caster at the Sinton plant. The parties agree that in June through July 2021, SMS published a paper in connection with the Association for Iron and Steel Technology ("AIST") conference. (ECF No. 445, ¶ 111); (ECF No. 454, p. 68). This paper

described the Sinton plant that SMS was in the process of building. (*Id.*). Danieli received the paper. (ECF No. 445, ¶ 113); (ECF No. 454, p. 68). Danieli claims that when Mr. Carboni read the paper he was "struck by the similarities between Danieli's QSP-DUE® caster and the new CSP® NEXUS caster that SMS alleged was its own." (ECF No. 445, ¶ 113). SMS contends that Mr. Carboni should not have been "struck by" alleged similarities between Danieli and SMS's technology. (ECF No. 454, pp. 68-71). Rather, SMS contends that Danieli was well-aware of SMS's caster designs prior to the 2021 paper. (*Id.* at 69). For example, SMS contends that as early as July 2015, Danieli's files included specifications for SMS caster roll diagrams. (*Id.*) Further, SMS contends that by 2018, Danieli had SMS's technical documents, including its Nucor Gallatin roll diagram. (*Id.*). SMS points out that the material Danieli had was identical to its Sinton designs in several relevant respects. (*Id.* at 46). SMS and Danieli are in stark disagreement about whether SMS's caster and Danieli's QSP casters were actually similar, much less so similar as to cause Danieli concern that SMS had stolen its trade secrets.

Danieli claims that it convened an in-house technical team to review the AIST Paper to evaluate the merits of a potential lawsuit. (ECF No. 445, ¶ 125). SMS, however, disputes the credibility of this claim. (ECF No. 454, pp. 83-84). It points out that one of Danieli's witnesses regarding the team, Giacomo Mareschi, could not remember anything about what the team did during its meetings. (*Id.*). SMS claims, for example, that Mr. Mareschi was unable to remember who attended the meetings, whether any minutes were kept, or whether he took any notes. (*Id.*). SMS further contends that Mr. Carboni admitted that it was merely a "'guess'" that SMS had Danieli documents in its files from SDI." (*Id.*).

It is undisputed that Danieli retained outside counsel and an expert, Dr. Brian Thomas, who opined that SMS misappropriated Danieli's trade secrets. (ECF No. 445, ¶ 131); (ECF No. 454,

p. 89). SMS disputes the basis and validity of Dr. Thomas's opinions. (ECF No. 454, p. 89). Danieli filed this lawsuit. (ECF No. 171).

It is undisputed that after an initial round of discovery focusing on Danieli's request for preliminary injunctive relief, Danieli filed its Amended Complaint, completely changing its theory of the case. In the Amended Complaint, Danieli's theory is that SMS misappropriated its trade secret(s) over an extensive period of time, rather than its prior theory relating solely to the Sinton plant. On August 13, 2024, the Court issued a Memorandum Opinion and Order granting SMS's Motion for Summary Judgment on all of Danieli's claims. There, the Court found that Danieli was unable to offer a legally sufficient definition of what trade secret(s) it claims SMS misappropriated.

### III. STANDARD OF REVIEW

Summary judgment is warranted if the Court is satisfied that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material if it must be decided to resolve the substantive claim or defense to which the motion is directed. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is a genuine dispute of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The Court must view the evidence presented in the light most favorable to the nonmoving party. *Id.* at 255. It refrains from making credibility determinations or weighing the evidence. *Id.* "[R]eal questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof[]" will defeat a motion for summary judgment. *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007).

The Court notes that Rule 56 "mandates the entry of summary judgment … against a party who fails to make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322; *see also Fuentes v. Perskie*, 32 F.3d 759, 762 n.1 (3d Cir. 1994) (stating that the nonmoving party must "point[] to sufficient cognizable evidence to create material issues of fact concerning every element as to which the nonmoving party will bear the burden of proof at trial"). "[A] complete failure of proof concerning an essential element of the nonmoving party's [claim] necessarily renders all other facts immaterial," and thus "there can be 'no genuine [dispute] as to any material fact'" sufficient to survive the motion. *Id.* at 322–23. Moreover, judgment as a matter of law becomes appropriate. *See id.* at 323; *accord Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014) ("[W]here a non-moving party fails sufficiently to establish the existence of an essential element of its case on which it bears the burden of proof at trial, there is not a genuine dispute with respect to a material fact and thus the moving party is entitled to judgment as a matter of law.").

## IV.    ANALYSIS

### A.    SMS has standing to bring its counterclaims.

Danieli argues that SMS does not have standing to bring any claims that stem from SMS's use of "confidential and proprietary information belonging to *POSCO*." (ECF No. 446, p. 8 (emphasis in original)). SMS's counterclaims assert, as characterized by Danieli, that Danieli copied POSCO's roll geometry proposed to Shougang and passed it off as its own. (ECF No. 478, p. 7). This contention forms the basis of SMS's unfair competition claim and its claim for tortious interference with prospective contractual relations. The gist of Danieli's argument is that only POSCO, rather than SMS, has the right to pursue an action relating to Danieli's alleged copying and passing off of POSCO's roll geometry. Danieli acknowledges that the original agreement between SMS and POSCO "gave SMS a limited right to participate in enforcing POSCO's

intellectual property." (ECF No. 446, p. 9); (ECF No. 478, p. 7). It argues that upon termination of this license, SMS no longer has the authority to raise any claim related to POSCO's technology. (ECF No. 446, p. 9).

SMS responds that its counterclaims are based on Danieli's harmful conduct and the effects to SMS that followed thereafter. SMS asserts "that this Danieli conduct harmed SMS's ability to win bids against Danieli at Shougang and elsewhere, and ultimately led to lost revenue." (ECF No. 453, p. 10). Specifically related to POSCO, SMS states that it "had a collaboration with POSCO and license during the Shougang bid and every bid since, and has a perpetual license to use that technology today." (*Id.*). Regardless, SMS contends that Danieli has not provided any legal authority to demonstrate how SMS and POSCO's contractual relationship, or lack thereof, affects SMS's standing to bring this suit—which seeks redress for damages suffered by SMS, not POSCO, arising from Danieli's alleged misconduct. (*Id.*).

Article III of the Constitution provides that federal courts may only exercise jurisdiction over "Cases" and "Controversies." U.S. Const. art. III, § 2. The doctrine of standing is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559 (1992). Article III standing is conferred when a plaintiff "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (internal citations omitted). The plaintiff bears the burden of showing the above three elements. *Id.* (internal citations omitted).

First, a plaintiff must show that he or she suffered an injury in fact. "To plead an injury in fact, the party invoking federal jurisdiction must establish three sub-elements: first, the invasion of a legally protected interest; second, that the injury is both 'concrete and particularized'; and

third, that the injury is 'actual or imminent, not conjectural or hypothetical.'" *Thorne v. Pep Boys Manny Moe & Jack Inc.*, 980 F.3d 879, 885 (3d Cir. 2020) (quoting *Spokeo*, 578 U.S. at 338). Second, Plaintiffs must show that their alleged injuries in fact are "fairly traceable to the challenged conduct of the defendant." *Spokeo*, 578 U.S. at 338.

> This requirement is akin to "but for" causation in tort and may be satisfied even where the conduct in question might not have been a proximate cause of the harm. An indirect causal relationship will suffice, provided that there is a fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant.

*Finkelman v. National Football League*, 810 F.3d 187, 193–94 (3d Cir. 2016). Third, a plaintiff must show that his or her injuries are "likely to be redressed by a favorable judicial decision." *Spokeo*, 578 U.S. at 338. Redressability requires a plaintiff "to show that it is 'likely, as opposed to merely speculative,' that the alleged injury will be redressed by a favorable decision." *Finkelman*, 810 F.3d at 194 (quoting *Lujan*, 504 U.S. at 561).

There is no merit to Danieli's standing argument. SMS is not pursuing its counterclaim based on harm suffered by POSCO. It does not purport to do so on behalf of POSCO. Rather, SMS claims damages relating to "lost revenues and profits from the Shougang Jingtang and Nucor Gallatin bids; the loss of the ability to use Shougang Jingtang and Nucor Gallatin as reference plants; the costs of defending this action; and the unjustified harm to its reputation." (ECF No. 188, ¶ 133). SMS also claims that it lost revenues and profits from other bids as a result of Danieli's conduct. (ECF No. 453, pp. 10, 12, 15). The license between SMS and POSCO has nothing to do with SMS's standing to assert counterclaims for damages that it allegedly incurred as a result of Danieli's actions. There is no dispute that SMS had a license to use the POSCO technology. There is no dispute that SMS intended to use that technology for its own financial benefit. SMS's claim that Danieli engaged in unfair competition by copying the SMS/POSCO

design and using it to defeat SMS in the Shougang bid is firmly premised on SMS's assertion of harm and resultant damages to its own business and interests. SMS has standing to assert its counterclaim.

B. Genuine issues of material fact preclude summary judgment on SMS's counterclaim for unfair competition (Count I) and tortious interference with prospective contractual relations (Count IV).

Danieli argues that the Court should grant summary judgment in its favor on SMS's claims of unfair competition (Count I) and tortious interference with prospective contractual relations (Count IV). (ECF No. 446, p. 9). Danieli presents its arguments regarding these claims together because they arise from a similar theory—that Danieli interfered with SMS's ability to win bids at Shougang and elsewhere by essentially copying SMS's technology and passing it off as Danieli's own. (*Id.*).

Danieli contends that both causes of action include a shared element that SMS is required, but unable, to prove— "that during the Shougang bid in 2015-2016, Danieli obtained and used SMS/POSCO confidential and proprietary information." (*Id.*). Danieli presents two arguments as to why summary judgment should be entered in its favor on SMS's Counts I and IV. (*Id.*). Danieli first argues that no reasonable jury could find that the "at-issue information" is confidential and/or proprietary to SMS or POSCO. (*Id.*). Second, Danieli asserts that SMS failed to offer evidence that Danieli used the at-issue information. (*Id.* at 16).

Related to Danieli's first argument, it contends that SMS has failed to explain how any of the information Danieli received in connection with the Shougang bid was "confidential." (*Id.* at 9). Specifically, Danieli asserts that the "sensitive information" it received "pertained to Shougang's evaluation of the bids and POSCO's marketing messages—not any technical details." (*Id.* at 11(emphasis in original)). Danieli argues that SMS did not proffer evidence to refute this,

so summary judgment is warranted in its favor on these claims. (*Id.* at 12–13). Moreover, Danieli reiterates that this information was not proprietary to SMS, rather, it was either POSCO's confidential technology or design concepts well-known in the industry. (*Id.* at 14–15). Even if it was proprietary, Danieli asserts that SMS failed to offer evidence of any efforts it took to keep the information confidential. (*Id.* at 15–16).

As to Danieli's second argument, it asserts that SMS cannot prevail on its Count I or IV absent a showing of improper use by Danieli. (*Id.* at 17). Danieli argues that the undisputed facts demonstrate that its change in design during the Shougang bid was a result of learning the customer's preference, not because of any use of information related to the SMS/POSCO proposal. (*Id.* at 17–18).

SMS responds by arguing that its two claims are broader than Danieli's asserted propositions. (ECF No. 453, p. 11). Specifically, SMS takes issue with Danieli's argument that it is required to demonstrate misappropriation and misuse of confidential and/or proprietary information. Rather, SMS argues that both causes of action encompass broader conduct that does not depend on demonstrating that the information at issue was confidential and/or proprietary.

As to Count I, SMS asserts that its unfair competition claim "has never been based solely on a theory of misuse of confidential information." (*Id.* at 11). Rather, SMS's claim relates to Danieli's actions in passing off SMS's product as its own, making deceptive misrepresentations, using this lawsuit as a tool in the marketplace, and tortious interference related to the Shougang and subsequent bids. (*Id.* at 11–12). Indeed, SMS has abandoned any theory that Danieli engaged in unfair competition by using its confidential information.[2]

---

[2] SMS states that it "acknowledges that SMS did not have a non-disclosure agreement with Shougang during the Shougang bid. SMS will no longer pursue its counterclaim for unfair

Danieli addresses each of SMS's asserted theories in its reply. (ECF No. 478, pp. 7–15). It first argues that SMS attempts to "shoehorn" its unfair competition claim into one for reverse passing off. (*Id.* at 8). It asserts that SMS cannot prevail under this theory because SMS did not offer evidence that Danieli sold SMS's goods as its own. (*Id.* at 8–9). Rather, SMS alleges that Danieli unlawfully received and/or used proprietary design concepts to create competing designs that Danieli then sold under its own name. (*Id.*). This theory, Danieli contends, cannot survive summary judgment because (1) no reasonable jury could find that Danieli offered the SMS/POSCO designs as its own, (2) SMS failed to present evidence that any customer was unable to distinguish SMS's products from Danieli's offerings, and (3) there is no nexus between SMS's passing off theory and its requested damages. (*Id.* at 9–12).

Danieli next argues that SMS's counterclaims cannot proceed based on a theory that Danieli made deceptive misrepresentations about both its and SMS's respective technology and capabilities. (*Id.* at 13–14). Danieli asserts that SMS did not elaborate on Danieli's purported misrepresentations beyond alleging that Danieli was "passing off the QSP2 roller design as its own." (*Id.* at 13). Danieli emphasizes there was nothing deceptive or incorrect about such a representation. (*Id.*). Accordingly, Danieli contends that SMS has not created a triable dispute based on these allegations.

Finally, Danieli addresses SMS's theory that Danieli has used this litigation as a tool to restrain competition in the marketplace. (*Id.* at 14–15). Danieli contends that this theory is based solely on unsupported accusations and conclusory statements. (*Id.* at 14). It contends that SMS has presented no evidence as to how this litigation has purportedly given Danieli an advantage in

---

competition to the extent premised on Danieli unlawfully using information that was confidential to SMS or SMS and POSCO." (*Id.* at 13 (internal citations omitted)).

the marketplace. (*Id.*). Danieli argues that SMS failed to offer evidence of any action Danieli took related to these accusations. For instance, Danieli highlights that there is no evidence that it ever mentioned this litigation to a prospective customer. (*Id.*). Without more, Danieli asserts that summary judgment in its favor is warranted.

i. Unfair Competition (Count I)

SMS claims that Danieli engaged in unfair competition in four ways. The first two theories relate to Danieli's alleged passing off of SMS's technology as its own: "making deceptive misrepresentations about Danieli's and about SMS's technology and capabilities during the Sinton Plant bid and other bids," and "unlawfully passing off technology as its own in Danieli's bids for SDI Sinton, Nucor Gallatin, Shougang Jingtang, and others." (ECF No. 188, ¶ 131). SMS also pursues two unfair competition theories based on Danieli's alleged misuse of legal process to hinder SMS in the market: "using this lawsuit as a tool in the marketplace to restrain legitimate competition (including by interfering in a reference plant visit by an SMS customer to the Sinton Plant," and "tortiously interfering with SMS's prospective contractual relations." (*Id.*).

"[T]he contours of Pennsylvania unfair competition law are not entirely clear." *Checker Cab Philadelphia, Inc. v. Uber Techs., Inc.*, 689 F. App'x 707, 709 (3d Cir. 2017) (citing *Granite State Ins. Co. v. Aamco Transmissions, Inc.*, 57 F.3d 316, 319 (3d Cir. 1995)). Pennsylvania common law traditionally defines unfair competition as the "passing off" of a rival's goods as one's own, creating confusion between one's own goods and the goods of one's rival. *Scanvec Amiable Ltd. v. Chang*, 80 F. App'x 171, 180 (3d Cir. 2003) (internal citations omitted). However, the doctrine of unfair competition in Pennsylvania is not restricted to passing off. *Granite State Ins. Co. v. Aamco Transmissions, Inc.*, 57 F.3d 316, 319 (3d Cir. 1995) (citing *Carl A. Colteryahn Dairy, Inc. v. Schneider Dairy*, 203 A.2d 469, 473 (Pa. 1964)). "Pennsylvania courts have

13

recognized a cause of action for the common law tort of unfair competition where there is evidence of, among other things, trademark, trade name, and patent rights infringement, misrepresentation, tortious interference with contract, improper inducement of another's employees, and unlawful use of confidential information." *Synthes (U.S.A.) v. Globus Med., Inc.*, Civ. A. No. 04–1235, 2005 WL 2233441, at *8 (E.D. Pa. Sept. 14, 2005) (internal citations omitted).  For example, in *Colteryahn Dairy*, the Supreme Court of Pennsylvania held that it was unfair competition to make false or misleading representations regarding the circumstances under which an employee left a former employer. *Colteryahn Dairy*, 203 A.2d at 473. Additionally, courts have recognized that the Pennsylvania common law tort of unfair competition is coextensive with the definition set forth in the Restatement (Third) of Unfair Competition. *See, e.g., Bldg. Materials Corp. of Am. v. Rotter*, 535 F. Supp. 2d 518, 526 n. 4 (E.D. Pa. 2008) (citing *Babiarz v. Bell Atl.-Pa., Inc.*, No.2000–1863, 2001 WL 1808554, at *9 (Pa. Com. Pl. Jul. 10, 2001); and *Lakeview Ambulance & Med. Servs., Inc. v. Gold Cross Ambulance & Med. Serv., Inc.*, No.1994–2166, 1995 WL 842000, at *1–2 (Pa. Com. Pl. Oct. 18, 1995)).   Tortious interference may form the basis of a claim for unfair competition.  *ID Security Sys. Canada, Inc. v. Checkpoint Sys., Inc.*, 249 F. Supp. 2d 622, 688 (E.D.Pa.2003); *see also Yeager's Fuel, Inc. v. Pa. Power & Light Co.*, 953 F. Supp. 617, 668 (E.D. Pa. 1997).  Under Section 1 of the Restatement, "[a]s a general matter, if the means of competition are otherwise tortious with respect to the injured party, they will also ordinarily constitute an unfair method of competition."  Restatement (Third) of Unfair Competition § 1 cmt. g.  Nevertheless, the term may not be construed "as a virtual catch-all for any form of wrongful business conduct" or to "include all forms of modern business torts." *USX Corp. v. Adriatic Ins. Co.*, 99 F. Supp. 2d 593, 619 (W.D. Pa. 2000).

As to SMS's theory that Danieli passed off SMS's technology as its own, "[a] claim of unfair competition under Pennsylvania law requires proof that the defendant has 'passed off' the goods of one manufacturer or vendor as those of another, thus creating confusion between his own goods, and those of the rival." *Scanvec Amiable Ltd. v. Chang*, 80 F. App'x 171, 180 (3d Cir. 2003). "The law of unfair competition also requires that a company, entering a field already occupied by a rival of established reputation, must do nothing which will unnecessarily create or increase confusion between his goods or business and the goods or business of the rival." *Pennsylvania State University v. University Orthopedics, Ltd.*, 706 A.2d 863, 870-71 (Pa. Super. Ct. 1998). Thus, there is no question that misrepresentation and the resulting injury to an entity's reputation and/or manner of doing business creates an actionable claim for unfair competition. *Peek v. Whittaker*, No. 2:13-cv-O1188, 2014 WL 2154965, at *10 (W.D. Pa. May 22, 2014).

The Court holds that there are genuine issues of material fact that must be submitted to a jury as to whether Danieli engaged in unfair competition by passing off SMS's technology as its own and, thereby, harmed SMS's business. Specifically, faced with the evidence adduced by the parties, a jury could reasonably find that (1) Danieli's bid on the Shougang project was initially ranked behind SMS's bid; (2) Danieli was provided SMS/POSCO's technical specifications that were submitted in the Shougang bidding process; (3) based on that information, it redesigned its own submission in only three days and, thereafter, (4) won the Shougang bid by passing off as its own what was, ultimately, SMS/POSCO technology.

It is undisputed that in 2015 through 2016 Danieli and SMS both participated in a bid to supply a steel slab caster, in addition to other equipment, to Shougang. (ECF No. 445, ¶ 7); (ECF No. 454, p. 12). SMS and POSCO submitted a joint bid, with POSCO responsible for the roll diagram and SMS responsible for all other components. (ECF No. 445, ¶ 8); (ECF No. 454, p.

12).  The parties do not dispute that on or about February 26, 2016, Mr. Carboni met with Mr. Yang, project manager for Shougang.  (ECF No. 445, ¶ 12); (ECF No. 454, p. 15).    The parties also do not dispute that Mr. Carboni authored a February 26, 2016, email to Danieli engineers instructing them to prepare a new roll diagram for Danieli's submission.  (ECF No. 445, ¶ 15); (ECF No. 454, p. 17). In this email, Mr. Carboni unequivocally stated that "Customer is happy and finally they started to pass us some sensitive information about what they got from POSCO.  Not numbers, but concepts because POSCO did not give them any details.  This is strictly confidential!!!"  (ECF No. 447-19, p. 4).  It is undisputed that, only three days later, Danieli submitted a revised bid which was successful.  (ECF No. 454, p. 16).  SMS claims that this successful bid was essentially a copy of SMS/POSCO technology.

Danieli disputes that Mr. Carboni's email proves the scenario that SMS claims.  (ECF No. 478, p. 10).  It argues that Mr. Carboni was only told where Danieli was ranked in the bidding process.  (ECF No. 446, p. 11).  Moreover, it disputes that, in response to the email, Danieli copied SMS/POSCO technology.  (ECF No. 478, p. 10).   The parties offer very different interpretations of the email and Danieli's actions in response to the email.  This issue presents a quintessential disputed question of material fact.  SMS has presented evidence that, if believed, could lead a reasonable jury to conclude that Danieli (1) obtained information from Shougang about the SMS/POSCO bid submission, (2) used this information to copy the SMS/POSCO technology over three days and, (3) passed off that copy as Danieli's own product.

Reading the record in the light most favorable to SMS, the nonmoving party, the interpretation of Danieli's conduct—including and following the Carboni email—is a question for a jury, not the Court.  There is more than enough evidence to submit to a jury regarding the question

of whether Danieli engaged in unfair competition by passing off SMS/POSCO's technology as its own to gain an unfair advantage over SMS in the marketplace.[3]

### ii.    Tortious Interference with Prospective Contractual Relations (Count IV)

To establish a claim for tortious interference with prospective contractual relations under Pennsylvania law, a plaintiff must prove: "(1) [a] prospective contractual relationship; (2) purpose or intent to harm plaintiff by preventing the relationship from occurring; (3) absence of privilege or justification on the part of the defendant; and (4) occurrence of actual harm or damage to the plaintiff as the result of defendant's conduct." *Hough/Loew Associates, Inc. v. CLX Realty Co.*, Civ. A. No. 90-5859, 1992 WL 68289, at *5 (E.D. Pa. Mar. 20, 1992) (internal citations omitted); *see also Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 212 (3d Cir. 2009); *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 471 (Pa. 1979). Neither Danieli's Motion for Summary Judgment nor SMS's opposition develop an independent argument with respect to the tortious interference claim. Both address this claim together with the unfair competition claim, and both appear to view the claims as standing, or falling, together.

The Court holds that there are genuine issues of material fact as to whether Danieli engaged in tortious interference with prospective contractual relations. Specifically, there is no dispute that SMS and Danieli were competitors in bids for the Shougang project and others. There is, likewise, no dispute that Danieli's bid was successful on certain projects. As explained above, there are genuine issues of material fact as to whether Danieli won bids against SMS as a result of tortious

---

[3] One component of SMS's unfair competition counterclaim involved Danieli's use of its lawsuit to unfairly injure SMS in the market. For purposes of the pending motion, this component of SMS's claim is more akin to SMS's tortious interference and abuse of process counterclaims, addressed below.

conduct. A jury will decide SMS's claim for tortious interference with prospective contractual relations.

C. <u>Genuine issues of material fact preclude summary judgment on SMS's claims for tortious interference with contractual relations (Count III) and abuse of process (Count V).</u>

SMS's claims for tortious interference with contractual relations (Count III) and abuse of process (Count V) arise from related allegations of misconduct—that Danieli initiated this litigation for the improper purpose of hindering SMS's business, specifically with respect to the Sinton project. As with Counts I and IV, the parties' briefing on summary judgment generally groups these counts together.

On their merits, Danieli asserts that both of SMS's counterclaims fail because no reasonable jury could find that Danieli filed this litigation as a sham, or to interfere with SMS's Sinton contract. (ECF No. 446, pp. 21–29). Danieli argues, as a threshold matter, that the Court need not look to the merits of SMS's counterclaims because both claims are barred by the *Noerr-Pennington* doctrine. The Court will analyze Danieli's *Noerr-Pennington* defense and then proceed to its merits-based arguments.

i. <u>Issues of fact preclude a determination that SMS's counterclaims are barred by the *Noerr-Pennington* doctrine.</u>

The *Noerr-Pennington* doctrine is rooted in the First Amendment's guarantee of a citizen's right to petition the government. *A.D. Bedell Wholesale Co. v. Philip Morris Inc.*, 263 F.3d 239, 252-54 (3d Cir. 2001). It protects parties who petition the government for redress from claims arising in response to that petitioning. *Id.* at 255 n. 34. The United States Court of Appeals for the Third Circuit has summarized the origin of the doctrine:

> The *Noerr–Pennington* doctrine takes its name from a pair of Supreme Court cases that placed a First Amendment limitation on the reach of the Sherman Act. In *Noerr*, railroad companies, fearful of the growing power of the trucking industry,

sought to use their considerable resources to encourage adoption of laws and regulations that would encumber truckers. The truckers responded by suing the railroad companies for violation of the Sherman and Clayton Anti-Trust Acts. The case reached the Supreme Court, which held that the railroads' First Amendment rights to petition the government must override statutory limitations on anticompetitive behavior. The Court explained: "The right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to invade these freedoms." The Court soon extended this protection to efforts to influence executive action in *Pennington*. There, the Court held that "efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal . . ." The Court concluded that efforts to influence government action were protected from liability even if driven by an illicit intent.

*Campbell v. Pennsylvania School Boards Association*, 972 F.3d 213, 218 (3d. Cir. 2020). While the *Noerr-Pennington* doctrine arose in the antitrust context, it has been extended "to offer protection to citizens' petitioning activities in contexts outside the antitrust area." *We, Inc. v. City of Philadelphia*, 174 F.3d 322, 326-27 (3d. Cir. 1999). This protection includes the right to bring a lawsuit. *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972) ("Certainly the right to petition extends to all departments of the Government. The right of access to the courts is indeed but one aspect of petition."). The Third Circuit has held that claims for tortious interference and malicious use of process are subject to *Noerr-Pennington* immunity. *VIM, Inc. v. Somerset Hotel Ass'n*, 19 F. Supp. 2d 422, 430 (W.D. Pa. 1998) (citing *Brownsville Golden Age Nursing Home, Inc. v. Wells*, 839 F.2d 155, 156, 160 (3d Cir. 1988)).

The *Noerr-Pennington* doctrine does not completely foreclose common law remedies arising out of the initiation and maintenance of legal actions. Rather, courts have recognized an exception when the petition—in this case a lawsuit— was merely a sham designed to injure the opposing party, rather than to seek legitimate redress. *Campbell*, 972 F.3d at 219. "[A]ctivity 'ostensibly directed toward influencing governmental action' does not qualify for [First Amendment] immunity if it 'is a mere sham to cover . . . an attempt to interfere directly with the business relationships of a competitor.'" *In re Wellbutrin XL Antitrust Litigation Indirect Purchaser Class*, 868 F.3d 132, 148 (3d. Cir. 2017) (internal citations omitted). The Supreme Court has outlined a two-part test to determine whether a lawsuit is a sham: First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an

objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*, and an antitrust claim premised on the sham exception must fail. Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part ..., the court should focus on whether the baseless lawsuit conceals an attempt to interfere *directly* with the business relationships of a competitor through the use of the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon. This two-tiered process requires the plaintiff to disprove the challenged lawsuit's *legal* viability before the court will entertain evidence of the suit's *economic* viability.

*Prof'l Real Estate Inv'rs Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-61 (1993). The

Supreme Court explained that "[t]he existence of probable cause to institute legal proceedings

precludes a finding that an antitrust defendant has engaged in sham litigation." *PRE*, 508 U.S. at

62. In selecting "probable cause" as the standard by which to judge objective baselessness, the

Court said that it was drawing from "[t]he notion of probable cause, as understood and applied in

the common law tort of wrongful civil proceedings[.]" *Id.* "Under the objective baselessness

prong, a probable cause determination irrefutably demonstrates a defendant's immunity." *Federal*

*Trade Commission v. AbbVie, Inc.*, 976 F.3d 327, 360 (3d. Cir. 2020). A litigant has probable

cause to initiate a suit if the litigant has "a reasonable belief that there is a chance that a claim may

be held valid upon adjudication." *Wellbutrin*, 868 F.3d at 148 (quoting *PRE*, 508 U.S. at 62-63).

When determining whether there was probable cause to initiate a lawsuit, the Court must focus on

the time the action was filed. *Id.*; *see PRE*, 508 U.S. at 60 n.5, (cautioning that "when the antitrust

defendant has lost the underlying litigation, a court must resist the . . . temptation to engage in *post*

*hoc* reasoning by concluding that an ultimately unsuccessful action must have been unreasonable

or without foundation").

In *PRE*, the Supreme Court held that whether a litigant had probable cause may be decided

by a court as a matter of law when "there is no dispute over the predicate facts of the underlying

legal proceeding." 508 U.S. at 63. Indeed, "[t]he question of whether a petition is a sham is

20

generally a question of fact for the jury." *In re Flonase Antitrust Litigation*, 795 F. Supp. 2d 300, 310 (E.D. Pa. 2011) (quoting *Independent Taxicab Drivers' Employees v. Greater Houston Transportation Company*, 760 F.2d 607, 612 n.9 (5ᵗʰ Cir. 1985)). In other words, "[t]he court decides the existence of probable cause, gross negligence, or improper purpose as a matter of law when the facts are not in dispute. If there is a factual dispute as to probable cause, gross negligence, or improper purpose, then the matter is for the fact-finder to determine." *Schmidt v. Currie*, 217 F. App'x 153, 155–56 (3d Cir. 2007) (internal citations omitted).

If an action is deemed to be objectively baseless, a court must next examine the subjective motivation of the party that brought the lawsuit. *PRE*, 508 U.S, at 60-61. Under this prong, a plaintiff "must show the defendant brought baseless claims in an attempt to thwart competition (*i.e.*, in bad faith)." *AbbVie Inc.*, 976 F.3d at 360 (quoting *Octane Fitness, LLC v. ICON Health & Fitness, Inc.,* 572 U.S. 545, 556 (2014)). In considering a party's subjective motivation to initiate a lawsuit, the Court may consider:

> whether the defendant was indifferent to the outcome on the merits of the . . . suit, whether any damages for infringement would be too low to justify . . . investment in the suit, or whether [the defendant] had decided to sue primarily for the benefit of collateral injuries inflicted through the use of legal process.

*Id.* at 360-61 (citing *PRE*, 508 U.S. at 65-66).

The burden to show that litigation was a sham is on the party trying to circumvent the application of the *Noerr-Pennington* doctrine. *Trustees of Univ. of Pennsylvania v. St. Jude Children's Rsch. Hosp.*, 940 F. Supp. 2d 233, 245 (E.D. Pa. 2013). Indeed, a plaintiff seeking to show the sham litigation exception faces "an uphill battle." *AbbVie Inc.*, 976 F.3d at 361 (quoting *Wellbutrin*, 868 F.3d at 147). Danieli contends that SMS cannot satisfy either the objective or subjective prongs required to circumvent the protection afforded to Danieli under *Noerr-Pennington* immunity. (ECF No. 478, pp. 15-18).

Danieli argues that SMS has not met its burden of showing that Danieli's action was objectively baseless. (*Id.* at 15-17). In other words, Danieli contends that SMS has not proven that no reasonable litigant in Danieli's shoes could believe that it could obtain a successful result. (*Id.*). Danieli further asserts that its claims are not objectively baseless because "it had probable cause to believe SMS used Danieli's confidential and trade secret roll technology . . .for SDI at the Sinton Plant." (ECF No. 446, p.25). This probable cause, Danieli explains, resulted from its "diligent pre-suit investigation and independent expert analysis." (*Id.*). Danieli also argues that its initial probable cause has only been substantiated throughout discovery and the evidence produced therefrom. (*Id.* at 26).

Under the subjective prong, Danieli argues that SMS has failed to show that Danieli used a legal process as a weapon, that it filed suit in bad faith, or that Danieli has used this litigation as an anti-competitive tool. (*Id.* at 22). Rather, Danieli claims that it "undertook an extensive, good-faith analysis *before* deciding to bring its claims, even though it had every incentive to file suit as quickly as possible." (*Id.* (emphasis in original)). Danieli further argues that no cognizable harm to SMS would be realized unless and until Danieli prevailed on its claims. (*Id.* at 24–25).

As to Danieli's *Noerr-Pennington* arguments, SMS first argues that the allegations in its counterclaims— which the Court found were sufficient to support the objective baselessness prong at the motion to dismiss stage (ECF No. 268, pp. 27–32) — are now facts established by the evidence. (ECF No. 453, p. 20). SMS specifically contends that there is ample evidence to support a jury finding that Danieli knew (1) SMS had the capabilities to supply an "intermediate-thickness, high speed" caster, (2) SMS's design for Sinton was fundamentally different than Danieli's own design when it filed this lawsuit, and (3) Danieli's claims for trade secret misappropriation were baseless, yet it filed suit anyway. (*Id.* at 20–22). Additionally, SMS asserts that any "false or

misleading" statements Danieli has made in its filings are material misstatements, thus undermining any claim of *Noerr-Pennington* immunity. (*Id.* at 23).

SMS further argues that "[t]here is more than sufficient evidence of Danieli's subjective motivation to use this lawsuit for anticompetitive purposes . . . ." (*Id.*). SMS points to (1) Danieli's leaders' desire to file this lawsuit, which SMS contends was done irrespective of its merits; (2) that there is no evidence that Danieli's in-house team performed a meaningful pre-suit investigation to assess if any copying occurred; and (3) that SMS has explained its inability to use Sinton as a reference plant as a cognizable harm resulting from the initiation of this lawsuit. (*Id.* at 24–27). Thus, SMS asserts, Danieli has failed to demonstrate that it filed suit for any reason other than to use the legal process as a tool in the marketplace. (*Id.* at 28).

There is no question that Danieli's subjective intent in bringing this action is replete with disputed issues of fact. Whether Danieli's subjective purpose was to secure judgment on the merits, rather than merely causing SMS business harm, is a question that the Court cannot answer. The threshold question is whether Danieli's action was objectively baseless. The Court holds that it cannot determine, as a matter of law, whether Danieli's lawsuit was objectively baseless. As the Supreme Court explained in *PRE*, a court may only decide, as a matter of law, whether there was probable cause to initiate a lawsuit when there is "no dispute over the predicate facts of the underlying legal proceeding." 508 U.S. at 50. No such situation is present here. Indeed, the parties have stark irreconcilable disputes regarding the facts underlying Danieli's initiation of its action.

The Court ultimately granted summary judgment in favor of SMS on Danieli's claims. (ECF No. 568). While the Court's grant of summary judgment is not dispositive for purposes of the objective prong of the sham litigation exception, the reasons underlying the Court's grant of

summary judgment to SDI on Danieli's claims creates questions of fact as to the objective merits of those claims. All of Danieli's claims are centered around the theory that SMS misappropriated Danieli's trade secret(s) with respect to the technology that SMS installed at the Sinton plant.[4] The Court granted summary judgment to SDI on Danieli's claims because Danieli was never able to articulate what trade secret(s) formed the basis of its claims. To the extent that Danieli did not actually have a trade secret relevant to the technology ultimately installed in the Sinton plant, and/or none of SMS's designs wrongly incorporated Danieli trade secrets, it could be determined that Danieli lacked probable cause to initiate this action. That is the core question underlying whether Danieli had an objective basis to bring its claim. *See PRE*, 508 U.S. at 62.

In addition, there are factual disputes regarding Danieli's pre-litigation knowledge of SMS's caster technology and whether it knew, from the beginning, that SMS's technology was unrelated to its QSP technology. For example, Danieli claims that it was unaware of the alleged similarities between SMS's caster technology and its QSP technology until approximately July 2021 when it read the paper SMS published in connection with the AIST conference. (ECF No. 445, ¶ 111). On the other hand, SMS counters that Danieli was well-aware of SMS's caster designs before the 2021 paper. (ECF No. 454, pp. 69). SMS contends that as early as July 2015, Danieli's files included specifications for SMS caster roll diagrams. (*Id.*). SMS also contends that by 2018, Danieli had SMS's technical documents, including its Nucor Gallatin roll diagram. (*Id.*). Further, SMS and Danieli are in stark disagreement about whether SMS and Danieli's casters were actually similar, much less so similar as to cause Danieli concern that SMS had stolen its trade secrets. These factual disputes preclude the Court from determining, as a matter of law, whether Danieli

---

[4] It is immaterial, for the purposes of this analysis, whether the misappropriation occurred in the course of the Sinton bidding process (as initially alleged in the original complaint), (ECF No. 68), or earlier (as alleged in the Amended Complaint), (ECF No. 171).

had probable cause to initiate this action. Thus, the Court cannot hold, as a matter of law, that Danieli had an objective basis to bring its claim. This is a question for the jury.

### ii. Questions of fact preclude summary judgment on whether Danieli engaged in tortious interference and abuse of process.

The Court holds that questions of fact preclude summary judgment in relation to SMS's claims for abuse of process and tortious interference with existing contractual relations. As discussed above, the parties group these two counts together in their argument because both counts arise from the same general theory. SMS's tortious interference claim is based on the argument that Danieli initiated this lawsuit, knowing that it was baseless, solely to hinder SMS in the marketplace by interfering with its contract with SDI. (ECF No. 453, pp. 17-18). SMS's abuse of process count is based on its contention that Danieli continued this litigation, knowing that it is meritless, to cause SMS expense and interfere with its business. (*Id.* at 22). In the Court's estimation, these two counts stand or fall together. Both center around the filing and maintenance of Danieli's claims against SMS. If Danieli's lawsuit was initiated and/or maintained for the appropriate purpose of securing legal relief, SMS's claims must fail. If Danieli's claims were initiated and/or maintained for malicious purposes, one or both of SMS's claim may succeed. The record requires that these questions regarding Danieli's lawsuit be submitted to a jury.

SMS and Danieli vehemently dispute the facts surrounding the initiation of Danieli's lawsuit. SMS argues that Danieli claimed that SMS stole its QSP technology all the while having actual knowledge that SMS's preexisting, independent technology could not be plausibly viewed as a copy of Danieli's QSP technology. For example, the parties strongly disagree as to the role of Dr. Brian Thomas in the analysis of Danieli's prospective claims. Danieli claims that Dr. Thomas's opinion informed its view that SMS "obtained and used Danieli's confidential information to construct the Sinton Plant Caster." (ECF No. 445, ¶¶ 132-33). SMS counters that "Danieli had

SMS's VLB caster designs in its files for years prior to the Sinton Project, including SMS's roll diagram for Nucor Gallatin in 2018, which contained significant similarities to the AIST Paper." (ECF No. 454, p. 74). This factual dispute is material because Danieli claims that it brought this action only after discovering the alleged similarity of SMS's technology to its own in the AIST Paper. (ECF No. 445, ¶¶ 125-40). The parties further dispute whether "Danieli reached a good faith belief that SMS had misappropriated its trade secrets." (ECF No. 445, ¶ 138); (ECF No. 454, p. 94). SMS argues that Danieli knew about SMS's designs and capabilities, and that Mr. Carboni admitted that it was a "guess" that SMS was passed Danieli documents by SDI. (ECF No. 454, p. 78). Further, SMS claims that Mr. Carboni testified that "had he known that Danieli had SMS technical specifications in its files prior to filing this lawsuit, he would have never submitted his declaration in this case supporting Danieli's motion for a preliminary injunction." (*Id.*). The record demonstrates that there are numerous disputed facts relating to Danieli's decision to initiate and maintain its action. Moreover, issues relating to its motivation involve credibility determinations that are properly reserved for a jury.

## V.    CONCLUSION

For these reasons, Danieli's motion for summary judgment will be denied. An Order of Court will follow.

BY THE COURT:

WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

_11/14/24_
Dated